751 A.2d 168

**James H. DAVIS**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (SWARTHMORE BOROUGH).**

**Appeal of Borough of Swarthmore.**

Supreme Court of Pennsylvania.

Argued Feb. 2, 1998.

Decided May 18, 2000.

Anthony J. Bilotti, Broomall, J.B. Todd McCoy, Philadelphia, for appellant Borough of Swarthmore.

S. Stanton Miller, Jr., Media, for appellee James H. Davis. David S. Hawkins, Secretary W.C.A.B.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

ZAPPALA, Justice.

■ This is an appeal by the Borough of Swarthmore from the Commonwealth Court's order reversing the order of the Workers' Compensation Appeal Board, which denied benefits to James Davis, a former police officer for the Borough. We granted the Borough's petition for allowance of appeal to address the issue of the standard to be applied to claims for workers' compensation benefits when the claimant asserts that a psychic injury is manifested through both psychic and physical symptoms. We hold that where a psychic injury is claimed, regardless of whether it is manifested through psychic symptoms alone or physical symptoms as well, the claimant must establish that the injury arose from abnormal working conditions in order to recover benefits. We reverse the Commonwealth Court's order in this case and reinstate the Board's order denying benefits.

On April 21, 1992, James Davis filed a claim petition under the Workers' Compensation Act alleging that he had sustained a psychic injury as a result of his employment as a police officer. Davis asserted that he suffered from post-traumatic stress disorder and specific work inhibition as a result of

repeated stressful and life-threatening experiences during the course of his duties as a police officer.

At the hearing before the workers' compensation judge (WCJ), Davis testified that he had been hired as a police officer by the Borough in July of 1960. The population of the Borough of Swarthmore was approximately 5,900, including 1,300 college students, while the size of the Borough was one plus square miles. The Borough's police force consisted of eight officers, including the chief of police, a sergeant, a corporal and five patrol officers. In May of 1971, Davis was promoted to the position of sergeant. As the sergeant, Davis was the second in command after the chief of police. His responsibilities included patrol functions, supervisory functions and investigative functions. The Borough did not have a separate detective division, and the responsibility for criminal investigations was given to the sergeant. The responsibility for supervising the police officers during the three eight-hour shifts was divided among the chief of police who worked the 8 a.m. to 4 p.m. shift, the sergeant who worked the 4 p.m. to midnight shift, and the corporal who worked the midnight to 8 a.m. shift.

For twenty years, Davis performed the functions assigned to him as the sergeant. On June 16, 1991, the Borough's chief of police died unexpectedly of a heart attack. Mayor G. Guy Smith issued an order four days later naming Davis, the ranking officer, as the officer in command of the police force. Davis remained in the position for a period of only four months.

Donald Lee was designated as the chief of police on October 15, 1991. Lee, then a 28–year veteran of the Swarthmore Police Department, had been Davis's close friend and partner on the police force. Lee testified on behalf of Davis that the functions performed by Davis were normal things that would be required of a detective sergeant in a town the size of Swarthmore. He further testified that he had not noticed any specific incident during their years together that triggered any change in Davis's conduct, but felt that Davis's position as second in command caused Davis to feel that his loyalty was

torn between the patrol officers and the chief of police. He discussed the fact that Davis had married and divorced twice, stating that Davis's marital difficulties did not affect his ability to carry out police functions.

It was not until Davis assumed the responsibilities of the chief of police that Lee observed a change in Davis. Lee testified that Davis demonstrated that he was incapable of being the police chief or acting chief. He described Davis as an acting chief who had difficulty making decisions that affected the police department. Davis also had difficulty dealing with officers under his command and with issuing orders to the patrolmen. Lee became so concerned about Davis's inability to command that he spoke to Mayor Smith on several occasions. Mayor Smith asked Lee to check on Davis because he was concerned about Davis's health and well being.

Mayor Smith, who also testified on behalf of Davis, felt that Davis had become paralyzed by his role as police chief. He stated that "it wasn't like he was making bad decisions; he simply wasn't making any decisions." Mayor Smith indicated that he would have discussions with Davis about getting certain tasks done, minor or major, without any results.

In October 1991, Mayor Smith recommended that Davis take vacation leave, which Davis did. Shortly thereafter, Lee informed Mayor Smith that he did not think Davis would be able to perform his functions as police chief. Mayor Smith concurred in this assessment and recommended to the Public Safety Committee of the Borough Council that Davis be allowed to go out on disability retirement. The recommendation was accepted, and Davis began receiving a disability pension as of May 1, 1992.

Davis testified that between June and October 1991, he noticed that he was not sleeping well, that "it seemed like his strength was being zapped," and that his blood pressure was up. Davis did not attribute the changes to his appointment as the acting police chief. Instead, Davis recounted several stressful incidents that had occurred during the course of his 31–year career. The first incident happened approximately 27

years earlier, in 1964 or 1965. Another officer had gone into a house and was confronted in the basement by a young man who was armed. Davis, who was the back up officer, began negotiations with the man and was able to convince him to put his weapon down. When Davis went to pick up the weapon, the man pulled out another weapon, pointed it at his face and started to pull the trigger. Davis caught the hammer of the weapon before it fell and wrestled the gun away from him. The disarmed man was then arrested. Davis testified that he continually dreamed about the incident, but that it was not until he underwent psychiatric treatment that he remembered the incident itself.

Davis testified regarding another incident which occurred in 1965 or 1966 when he became involved in a high speed pursuit of robbery suspects. During the course of the pursuit, Davis fired his weapon at a suspect for the first time in his career. Davis also related two other incidents in his career when he fired his weapon at suspects. Davis further testified about the 1974 arrest of a member of the Pagan motorcycle gang for attempted murder. Davis testified that the police chief informed him that unknown sources had threatened to shoot him and his family to prevent him from testifying at trial. Other than the reported threat, no incident occurred.

The only incident that was not remote in time occurred in January 1991. Davis responded to a call from Swarthmore College security officers for assistance in handling a group of 25 people he described as "a bunch of neo nazis." Davis called for assistance and confronted the group, along with four unarmed college security officers. No weapons were visible, but Davis ordered them to lay down whatever weapons they had within five minutes. The group lined up, refusing to comply. Faced with a standoff, Davis did not know what to do next. He was not attacked by any member of the group. When four other police officers responded to his call for assistance, 22 members of the group were arrested. The police officers recovered baseball bats, chains, knives, and tear gas—none of which was used or displayed during the incident.

Davis also testified that as a police officer he was required to undergo annual firearms training. He described himself as an expert shooter and well-versed in handguns. During his last qualification on the shooting range, Davis had to go through three rounds before he was qualified. Davis testified as follows:

Q. Explain what the qualification involves and why you had to go through it three times.

A. Well, we go through a practice shoot just before we can qualify. Then we take the weapon itself, target area, and type rounds were fired.

Then we fired for qualification the next round, and it took me three times to go through to qualify.

Q. What happened that it took you three times to qualify? Had it ever taken you three times to qualify before?

A. Never. I shook so bad, I couldn't shoot any more. I still don't today.

R.103a. Davis did not describe any other situation in which he had a similar experience.

Nor did Davis describe his experience as the acting police chief. He did not acknowledge any problems with assuming command of the officers. Davis testified only that when he took leave time in October of 1991, he experienced difficulties with sleeping. Davis consulted his family physician, who eventually referred him to a psychiatrist, Dr. Sol Kadish.

Dr. Kadish testified that he first saw Davis on January 30, 1992. Dr. Kadish diagnosed Davis as suffering from post-traumatic stress disorder and specific work inhibition. Post-traumatic stress disorder was defined to include when a person has experienced, witnessed or been confronted with an event that is life threatening or threatening to the person's or another's personal or physical integrity, and the event evokes fear, horror or helplessness. Dr. Kadish explained specific work inhibition as Davis's inability to return to work and fear of returning to work because of his stress symptoms. Dr. Kadish was of the opinion that the accumulation of events

experienced by Davis from 1965 until 1991 was the cause of Davis's psychic injury.

Dr. Kadish also described physical manifestations of Davis's psychic injury:

> He has a variety of related physical symptoms. He gets short of breath. He gets pressure on his chest. He becomes nervous. He has generalized muscle twitching with aches and pains. He has flashbacks and reliving experiences of these various stressors that occurred during his duty as a police officer and most significantly, his right-hand shakes. When he writes a check or holds a glass of water, his right hand feels tremulous and he feels very unsteady and, in fact, since he was sent out of work on October 23 rd, 1991, he has not touched his revolver.

R.192a.[1]

Davis's counsel asked Dr. Kadish for his expert opinion as to whether the right hand tremors were related to Davis's psychic injury. The Borough's counsel objected to Dr. Kadish rendering an expert opinion as to the cause of Davis's right hand tremors because Dr. Kadish had not been qualified as an orthopedic expert or qualified as an expert with regard to the physical components of Davis's claim, as compared to the psychic components. The Borough's counsel further asserted that no foundation had been laid that Dr. Kadish had ever performed a physical examination of Davis.

Because Dr. Kadish was testifying in a deposition, the Borough's objection was placed on the record and Dr. Kadish was permitted to respond for purposes of the deposition. Dr. Kadish testified that there was a direct temporal connection between the onset of Davis's hand tremors and an event that occurred while at work as a police officer. Dr. Kadish based his opinion on two events related to him by Davis, i.e. that Davis's hand shook sometime in 1986 after the arrest of an individual for murder and in 1993 when Davis's "right hand shook so badly that he *uncharacteristically* had to try three

1. The record does not reflect that Davis had any reason to use a revolver upon leaving the police force.

times before he could just barely qualify to continue his duties." (Emphasis added.)

On cross-examination, Dr. Kadish testified that he had not conducted a physical examination, neurological examination, or orthopedic examination of Davis. Dr. Kadish also stated that he had not requested any diagnostic studies to determine whether there was any pathological condition responsible for the right hand tremors.

The Borough introduced the deposition testimony of Dr. Wolfram Rieger, who examined Davis on July 6, 1993. Dr. Rieger did not conduct any psychological or psychiatric tests. He diagnosed Davis as suffering from an adjustment disorder with anxious mood. Dr. Rieger concluded that Davis was a man who simply suffered from job burn-out.

The WCJ awarded benefits to Davis, finding that "[a]s of October 23, 1991, Claimant suffered and continues to suffer, from a bona-fide psychiatric illness, which was caused by the abnormal objective working conditions imposed upon Claimant by Defendant in June, 1991." The WCJ found that in June, 1991, Davis's usual police duties had changed because he was instructed to perform the duties of the police chief in addition to his regular police duties, and that between June 1991 and October 1991, Davis had to fill in vacant patrol shifts himself because of manpower shortages. The WCJ did not specifically rule on the Borough's objection to the competency of Dr. Kadish to testify regarding the cause of Davis's right hand tremors, but relied upon his expert opinion in concluding that Davis "had developed physical impairments as a result of his job-related stress, including a right-hand tremor which directly affected his ability to continue to perform his employment duties."[2] The WCJ also found that during Davis's 31 year employment as a police officer, Davis had experienced numerous stressful and life-threatening incidents.

**2.** The issue of the competency of Dr. Kadish's testimony to establish a causal connection between the psychic injury suffered by Davis and the right hand tremors that Davis was found to have experienced is not before this Court, and will not be addressed for that reason.

The Workers' Compensation Appeal Board reversed the WCJ's decision. The Board discussed three categories of claims involving a psychological component: (1) psychological stimulus causing physical injury (mental/physical); (2) physical stimulus causing psychic injury (physical/mental); and (3) psychological stimulus causing psychic injury (mental/mental). Davis's claim was categorized by the Board as a psychological stimulus causing a psychic injury. The Board determined that Davis had failed to establish that abnormal working conditions had caused his psychic injury as required to recover benefits. The Board found that Davis's working conditions were not unusually stressful for police work, stating,

> [n]othing presented in the case would lead anyone to conclude that Claimant's experience differed from that of any other police officer. While his job did contain stress, that stress was normal for a police officer.

Slip opinion at 4.

On appeal to the Commonwealth Court, Davis raised two issues for review: (1) whether Davis's physical symptoms were a result of work-related stress justifying a finding that Davis suffered a compensable injury; and (2) whether Davis's work-related stress resulting from normal working conditions was sufficient to constitute a compensable injury. The Commonwealth Court reversed the Board's decision, concluding that Davis did not have to establish that his injury was caused by abnormal working conditions. The court reasoned that because Davis had introduced evidence that he was exposed to a psychological stress that caused him to suffer a distinct physical injury, i.e. right hand tremor, Davis was not required to prove abnormal working conditions. The court held that Davis was required to prove only that the psychological stress of normal working conditions caused a physical injury, stating that "he is not saddled with the heightened burden of proving an abnormal working condition." (Slip opinion at 6.)

We granted the Borough's petition for allowance of appeal to address the confusion engendered by the Commonwealth Court's application of a different burden of proof in cases where a claimant seeks benefits for psychic injury, asserting

that the psychic injury is manifested through physical symptoms.

Appellate review in workers' compensation proceedings is limited to determining whether constitutional rights have been violated, an error of law has been committed, or Board procedures have been violated, and whether necessary findings of fact are supported by substantial evidence. *Waugh v. Workmen's Compensation Appeal Board*, 558 Pa. 400, 737 A.2d 733 (1999); 2 Pa.C.S. § 704. The Borough asserts that the Commonwealth Court committed an error of law in failing to apply the proper standard in determining whether Davis was entitled to benefits. We agree.

Appellate review of the workers' compensation judge's findings of fact is limited to a determination of whether the findings are supported by the evidence as a whole. Where no additional testimony is taken before the Board, the findings will be overturned only if arbitrary or capricious. Whether the findings of fact support a conclusion that the claimant has been exposed to abnormal working conditions is a question of law, however, that is fully reviewable on appeal. *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, 542 Pa.614, 669 A.2d 338 (1996).

To recover workers' compensation benefits for a psychic injury, a claimant must prove by objective evidence that he has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). Even if a claimant shows actual, not merely perceived or imagined, employment events that have precipitated psychic injury, the claimant must still prove the events to be abnormal in order to recover. *Wilson*, 669 A.2d at 344

As we observed in *Martin*, the Workers' Compensation Act does not provide benefits to a claimant merely because of the claimant's status as an employee.

Abandoning the distinction between normal and abnormal working conditions, as the Appellant urges us to do, would

eliminate the element of causation. It would destroy the fundamental principle underlying the scheme of the Workmen's Compensation Act—that, in order to be compensable, an injury must be work-related. Under the Appellant's theory, a claimant would have to establish only that the employee suffered from a mental illness while employed and that the illness was a condition created or aggravated by that employee's perception of the conditions of his employment. That would reduce workmen's compensation benefits to nothing more than a disability or death benefit payable only because of the employee status of the claimant—and not because the injury was caused by his employment.

568 A.2d at 165.

In *Martin,* the wife of Charles Martin filed a fatal claim petition alleging that her husband's death from a self-inflicted gunshot resulted from job-related stress. Martin had been employed by Ketchum, Inc. as a professional fund raiser for non-profit organizations. After the company underwent several personnel changes, Martin requested that he be relieved of his supervisory responsibilities and assigned to campaign direction. Martin experienced problems with the campaign project and eventually was replaced at the request of the client. After reassignment to a less prestigious project, Martin began seeing a psychiatrist. Martin later committed suicide.

During the hearing on the fatal claim petition, a psychiatrist testified that Martin's removal from the larger campaign project played a substantial contributing role in his suicide. The referee granted benefits, finding that Martin had sustained a work injury in the form of work-related stress which resulted in suicide. The Commonwealth Court reversed on the basis that the work-related stress that Martin experienced was not so abnormal or unusual as to impose workmen's compensation liability upon the employer.

We affirmed, holding that a claimant who seeks to recover benefits for psychic injury must prove not only that he has suffered a psychic injury, but also that the injury is other than

a subjective reaction to normal working conditions. The latter requirement is imposed because "evidence of an employee's subjective reaction to being at work and being exposed to normal working conditions is not sufficient to establish an injury compensable under this act. . . ." 568 A.2d at 164. It was undisputed that Martin had suffered a psychic injury, but the second requirement, that the claimant prove that the psychic injury was other than subjective reaction to normal working conditions, was not met.

We have consistently rejected the argument that proof that a psychic injury was caused by normal working conditions establishes a compensable injury under the Act. In *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, the claimant sought to recover benefits for a psychic injury caused by the elimination of her administrative assistant position and reassignment to a position which she perceived as diminishing her status. The existence of a psychic injury was undisputed, as was the fact that the claimant suffered the psychic injury because she was assigned to a different position. We concluded, however, that the claimant had failed to sustain her burden of proving a compensable injury. We determined that the loss of employment, and the offer of a position of less responsibility as an alternative to unemployment, are not abnormal working conditions.

*Pennsylvania Human Relations Commission et al. v. Workmen's Compensation Appeal Board*, 546 Pa. 83, 683 A.2d 262 (1996), involved a claimant who was employed as an attorney with the Pennsylvania Human Relations Commission. The claimant had filed a claim petition seeking benefits, alleging that he had suffered an adjustment reaction with anxiety after he was given a performance evaluation by his employer. The referee awarded benefits and the Board affirmed. The Commonwealth Court reversed. We affirmed the denial of benefits, concluding that the attorney's psychic injury was a subjective reaction to normal working conditions.

In *Ryan v. Workmen's Compensation Appeal Board*, 550 Pa. 550, 707 A.2d 1130 (1998), the claimant sought to recover benefits for post-traumatic stress disorder following her in-

volvement in a work-related automobile accident. The claimant, who was employed as a visiting nurse, was injured in a collision with another vehicle. She sustained physical injuries as a result, including a fractured right patella, a bruised arm and a chest injury. The claimant received benefits pursuant to a notice of compensation payable. A final receipt was executed by the claimant upon her return to work.

The claimant began to experience depression and sought psychological treatment when she learned that the driver of the other vehicle had filed a lawsuit against her to recover damages for severe head injuries. The claimant subsequently filed a petition for review to amend her notice of compensation payable to reflect a work-related psychic disability as a result of the work-related physical injury. A petition for reinstatement of benefits also was filed.

During the hearing, the claimant introduced expert psychiatric testimony that she suffered from a post-traumatic stress disorder which was causally related to the automobile accident. The referee accepted the expert's testimony and granted her petitions. The Board reversed, finding that the evidence showed that the claimant's psychic injury was caused by the psychological stimulus of learning that she was being sued. The Board concluded that the claimant's psychic injury was not related to her employment and that there was only a tenuous causal relationship between the psychic injury and the accident.

The Commonwealth Court reversed the Board, finding that the claimant had sustained her burden of proving that a physical work-related stimulus of the automobile accident caused the claimant to be disabled with a psychic injury of post-traumatic stress disorder.

We reversed on the basis that the evidence did not support the referee's finding that the claimant's psychic injury was caused by her work-related accident. We determined that the stimulus of the psychic injury was not the physical stimulus of the accident, as found by the Commonwealth Court. The record established that the stimulus was the psychological

stimulus of the claimant's learning of being sued which triggered the psychic injury. We concluded that the claimant had failed to establish either prong of the *Martin* test for compensable injuries.

■ In this case, Davis asserts that *Martin* is inapplicable because he suffered not only from a psychic reaction to his working conditions, but also a physical reaction. We reject this analysis, as we have previously applied the *Martin* standard in cases where the claimant suffered a psychic injury that was manifested through both psychic and physical symptoms.

In *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board,* 544 Pa. 203, 675 A.2d 1213 (1996), a delivery truck driver for the Philadelphia Daily News filed a claim petition alleging that he had suffered a severe anxiety reaction and severe depression because of harassment by his supervisors. The claimant also experienced physical manifestations of his psychic injury, including dizziness and problems with sleeping and eating, after the incident. The referee awarded benefits; however, the Board reversed on the basis that a single episode of harassment or mistreatment did not constitute abnormal working conditions. The Commonwealth Court reversed the Board's decision, concluding that the claimant had sustained his burden of proving that an extraordinary event occurred at work that caused his psychic injury. We found that the Commonwealth Court erred in holding that a single episode of criticism by a supervisor who used vulgar language constituted an abnormal working condition under *Martin,* and reversed.

Similarly, in *Hershey Chocolate Company v. Com., Workmen's Compensation Appeal Board,* 546 Pa. 27, 682 A.2d 1257 (1996), the claimant filed a claim petition alleging that she suffered from a severe emotional disorder due to excess pressure and excessive work load changes in her job. The claimant suffered physical manifestations of her psychic injury as well, which included stomach pains, fatigue and disruptions in her sleeping patterns. The referee awarded benefits and

was sustained by the Board and Commonwealth Court. We reversed, finding that the evidence was insufficient to establish that the claimant's psychic injury was other than a subjective reaction to the increase in responsibilities occasioned by the claimant's promotion. We concluded that the claimant had failed to demonstrate that her responsibilities were unusual for her higher position.

As the foregoing survey indicates, *Martin* and its progeny reflect the view that there is a degree of uncertainty inherent in any employment situation, as in life itself, such that an employee's individual, subjective reaction to these ordinary vicissitudes is not the type of condition which the legislature intended to require compensation for because it is not, in the common understanding, an injury. Cf. *Metropolitan Edison Company v. Workmen's Compensation Appeal Board*, 553 Pa. 177, 718 A.2d 759 (1998). This understanding is not altered by the fact that the reaction may be accompanied by various deleterious physical symptoms.

Although we have previously indicated that the term "injury" is to be interpreted according to its common and approved usage, *Pawlosky v. Workmen's Compensation Appeal Board*, 514 Pa. 450, 525 A.2d 1204, 1209 (1987), it is readily apparent that there are circumstances, such as situations involving the effects of stress unrelated to physical exertion, that defy easy application of the term. In broad scope it may be suggested that the cases have attempted to distinguish between physical maladies that are directly caused by non-physical conditions or events occurring on the job, and those that are indirect, that is, existing only in relation to or as a result of a mental or emotional disturbance. In particular cases the distinction may appear artificial or contrived; indeed, it may have the effect of encouraging both claimants and employers to "shape" their cases along lines that do not always reflect medical science. However, it must be recognized that the constructs developed in *Martin* and other cases are nothing more than attempts to discern legislative intent: are workers' compensation benefits payable under the circumstances presented. If we have mis-

judged the General Assembly's intent, the Act can be amended to more clearly express the legislative policy.

In the absence of more definitive guidance, we conclude that it is the nature of the injury asserted, not the presence or absence of physical symptoms, that is controlling. Accordingly, we hold that the standard to be applied to claims for workers' compensation benefits when the claimant asserts a psychic injury that has manifested itself through psychic and physical symptoms is the same standard that we articulated in *Martin:* such a claimant must prove by objective evidence that he has suffered from a psychic injury and that the psychic injury is other than a subjective reaction to normal working conditions.

Applying this standard to Davis's claim, we find, as did the Board, that the evidence failed to establish that his post-traumatic stress disorder and related physical complaints were caused by abnormal working conditions.[3] "[P]sychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment." *Wilson,* 669 A.2d at 343 (citation omitted). There was absolutely no evidence that the investigatory and patrol functions performed by Davis or his experiences were unusual for a law enforcement officer. Davis himself testified that it was a usual part of his job to investigate crimes such as burglaries, stolen cars, assaults and murder. This testimony was supported by Davis's own witnesses, the Borough's mayor and Davis's partner, who subsequently served as the Chief of Police. Each of these witnesses testified that the functions performed by Davis were the normal things that would be required of a Detective Sergeant.[1]

3. Based upon its erroneous determination that Davis did not have to establish abnormal working conditions, the Commonwealth Court refused to address the issue of whether abnormal working conditions caused Davis's psychic injury.

4. We note that during the time that Davis assumed the command of the police force as the acting police chief, he was not required to perform any responsibilities that would not be expected of the highest ranking member of the force. Furthermore, Davis did not offer any evidence that his psychic injury was caused by his promotion.

Accordingly, the order of the Commonwealth Court is reversed.

Justice SAYLOR concurs in the result.

Justice NIGRO files a dissenting opinion.

NIGRO, Justice, dissenting.

I respectfully dissent from the majority's opinion to the extent it requires proof of abnormal working conditions when a claimant sustains physical injuries from a psychological stimulus.

First, I find that the majority, in weaving its way to its conclusion, makes ambiguous use of the term "injury." In workers' compensation claims, there are three cause and effect paradigms in which a psychological or "mental" component plays a role. The workers' compensation shorthand for these are known as 1) physical/mental (where a physical stimulus causes a psychic injury) 2) mental/mental (where a psychological stimulus causes a psychic injury), and 3) mental/physical (where a psychological stimulus causes a physical injury). *Volterano v. Workmen's Compensation Appeal Board (Traveler's Insurance Co.)*, 536 Pa. 335, 345, 639 A.2d 453, 457–57 (1994). Thus, in examining a claimant's petition, the element to the left of the slash mark indicates, very simply, what *happened* at the workplace; that is, what "befell" the employee such that he alleges he sustained a disability and cannot perform the job he was doing before something work-related happened. The effect on him, whether it be a disease, an affliction, a condition, a handicap, an illness, a death, (in other words, the harm done to his body) is expressed by the term following, or to the right of, the slash mark. In other words, what happened to him (left side of slash mark) made him *disabled* in either a physical or a psychological way (right side of slash mark).

The majority opinion urges that the problem with Davis's claim is that he confuses cause and effect. Yet, in the opinion itself, the word "injury" is used variously as the cause (left side) and as the result (right side), much to my confusion.

When indicating the cause of a claimant's disability, the majority improperly uses "injury" to be synonymous with stimulus, accident, event; but when indicating the disability itself, "injury" is used properly, as synonymous with symptoms, manifestation, reaction, disability, disorder. While the majority sets out to address the confusion which reigns in analyzing the cause and effect in workers' compensation claims, I believe it is only adding to the confusion by not insisting that the word "injury" means the *result* or the harm alleged to an employee. Thus, the *cause* or the condition precipitating the harm is not ever an "injury," and I don't believe Davis is claiming it is.

Nonetheless, despite the instant shifting back and forth of the word injury as both cause and effect, I believe I understand the majority opinion to stand for the proposition that *whenever* the cause of an injury is something psychological at the workplace, be it a traumatic psychological event, (such as, by example, when bank employees are taken hostage by robbers) or an ongoing condition (such as, again by example, repeated sexual harassment), whether or not the resulting disability is psychological (such as a nervous breakdown) or physical (such as a heart attack), the claimant must prove that the disability was caused by the work incident or condition *and* must prove that that responsible incident or condition was *abnormal* to that workplace. To the extent the majority is requiring abnormal working conditions in mental/physical claims, I disagree, as that is not what case law has held.

The majority cites to *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990) to require that Davis sustain the two-prong test stated therein. Specifically, *Martin* requires that a claimant prove that he suffered a psychic work-related injury and that such injury is other than a subjective reaction to normal working conditions. In *Martin*, the injured employee endured stress on the job and ultimately committed suicide. The claim was deemed "mental/mental," and the two-pronged test was therefore appropriate. Here, however, the WCJ found the testimony of Davis's medical expert to be "credible, and convincing" and furthermore found the testimony of the Borough's medical expert to be equivocal, unconvincing and

not credible. The WCJ found that Davis suffered from "psychiatric illness" *as well as* "physical impairments ... including a right-hand tremor" and "loss of sleep, shortness of breath, chest pressure and palpitations, muscle twitching, with aches and pains ..." which directly affected his ability to continue to perform his employment duties. The Workers' Compensation Appeal Board (Board) reversed, finding that Davis's claim should have been considered under the mental/mental paradigm requiring a showing of abnormal working conditions, and that the tremor was not sufficient as a physical injury to change the paradigm to mental/physical requiring a reduced burden of proof. Accepting the findings of the WCJ,[1] the Commonwealth Court characterized Davis's claim as mental/physical and reinstated the grant of benefits finding that Davis had met the mental/physical burden of proof regarding the hand tremors. Thus, as the instant case is properly characterized as mental/physical, *Martin* is eminently distinguishable. Instead, the facts and holding of *Whiteside v. Workers' Compensation Appeal Board (Unisys)*, 168 Pa. Cmwlth. 488, 650 A.2d 1202 (1994), *appeal denied*, 544 Pa. 650, 664 A.2d 978 (1995), are on point.

In *Whiteside*, the claimant experienced workplace stress due to a corporate merger in which she was assigned a new boss, new duties, an increased workload and longer hours. She was diagnosed with anxiety neurosis, headaches, angina, gastrointestinal problems including diarrhea and persistent abdominal pain. The WCJ granted benefits. The Commonwealth Court agreed, finding that Whiteside's claim fit the "mental/physical" paradigm.[2] The burden of proof articulated

1. Where, as here, the Board takes no additional evidence, an appellate court reviews the record in its entirety in order to determine whether the WCJ's factual findings are supported by substantial evidence. *Ryan v. Workmen's Compensation Appeal Board (Community Health Svcs.)*, 550 Pa. 550, 707 A.2d 1130 (1998). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* Furthermore, the WCJ determines all issues of testimonial credibility and such determinations bind the parties on appeal unless made arbitrarily and capriciously. *Id.*

2. Angina had previously been recognized as a compensable physical disability resulting from workplace stress. *Borough of Media v. Work-*

in *Whiteside* for mental/physical claims is that claimant must show distinct identifiable physical injuries and must present unequivocal medical testimony that causally connects the physical injury to the workplace. *Id.* at 494–95, 650 A.2d at 1205–06. Instantly, the majority rejected *Whiteside,* relying instead on *Martin* and, in doing so, ignored the findings of the WCJ[3] by deeming Davis's claim as purely mental/mental. The majority therefore recharacterized Davis's physical injuries as merely a physical "reaction" to his psychiatric illness.

I find that the majority's characterization, throughout its opinion, of a physical illness arising from a psychological stimulus as merely the "physical manifestation of psychic injury" to be so restrictive as to make recovery pursuant to the mental/physical paradigm nearly impossible under any circumstances. Based on the majority's present analysis, it in effect has eliminated the mental/physical paradigm. According to the majority's interpretation, despite case law to the contrary, a heart attack,[4] angina, colitis,[5] or an ischemic heart condition[6] would be merely "related physical complaints" attendant to the stress reaction a claimant would suffer from workplace trauma or pressures. Thus, wherever the cause is psychological, I read the majority opinion as relabeling the physical injury as a psychological injury with "physical man-

*men's Compensqtion Appeal Board* (Dorsey), 134 Pa. Commw. 573, 580 A.2d 431 (1990).

**3.** Davis presented unequivocal credible evidence that, *inter alia,* his hand tremors were related to his assumption of the stresses of the police chief's position following the sudden death of his longtime boss and co-worker, his added duties due to manpower shortages, his new responsibilities and longer hours.

**4.** *See, e.g., Washington Food Specialties, Inc. v. Workmen's Compensation Appeal Board (Britko),* 144 Pa. Commw. 226, 601 A.2d 439 (1991), *appeal denied,* 533 Pa. 603, 617 A.2d 1277 (1992) (finding heart attack caused by work-related stress compensable).

**5.** *See, e.g., Breen v. Commonwealth Crime Com'n,* 52 Pa. Commw. 41, 415 A.2d 148 (1980) (workplace stress resulting in colitis is mental/physical and claimant need not establish abnormal working conditions).

**6.** *See, e.g., Steinle v. Workmen's Compensation Appeal Board,* 38 Pa. Commw. 241, 393 A.2d 503 (1978) (holding work-stress caused ischemic heart condition to be compensable injury).

ifestations," instead of recognizing that physical illness may result directly from a psychological workplace stimulus. I contend that, merely because the cause (the event at the workplace) of certain physical ailments may have a psychological component, the physical injury (the effect on the employee) is *not* metamorphosed into a psychological injury with physical manifestations and the subsequent burden of proof is *not* the two pronged *Martin* test. Instead, where, as here, a physical injury results from a psychological stimulus, the proper burden of proof is that articulated for a mental/physical claim under *Whiteside.*

Finally, I find the majority's citing to *Metropolitan Edison Co. v. Workmen's Compensation Appeal Board (Werner)*, 553 Pa. 177, 718 A.2d 759, 1998 WL 668323, misleading in the context of this case. The appellant in *Metropolitan Edison* claimed to be suffering from shift work maladaptation syndrome due to being rotated between day and night schedules for more than twenty years. This Court denied him disability benefits finding that the schedule rotations were a normal working condition of employment with Metropolitan Edison. In other words, we found that there were certain conditions of being employed that were just unavoidable (like having to report to a place a business, having to work a certain number of hours, and having to do so within an employer's schedule) and cannot, alone, be considered triggers of either mental or physical work-related injury. The *Metropolitan Edison* Court merely considered the threshold question of whether work shifts, an ordinary element of the job, could, in and of themselves, be deemed the cause of any workplace injury. I joined the majority opinion as I believed that being scheduled on or rotated between day and night shifts was not a cause or stimulus which could result in a compensable injury—mental or physical. It was not necessary, therefore, to determine whether shift work maladaptation syndrome was a physical or a mental condition as it was not compensable either way. We therefore did not assign a burden of proof to such a claim. *Id.* at *6 n. 2, 718 A.2d at 764 n. 2. I therefore find the majority's reliance on *Metropolitan Edison* for anything but the thresh-

old determination that shift work does not constitute a viable cause of injury under the Act, to be misplaced, unpersuasive, and having no bearing whatsoever on the instant case or the burden of proof required of Davis.

In conclusion, I find that the requirement of proving abnormal working conditions when a physical injury results from a psychological workplace cause is improper and instead would find that the proper burden of proof is the long-held requirement that a claimant must show distinct identifiable physical injuries which, through unequivocal medical testimony, are shown to be connected to the workplace. *Whiteside,* 650 A.2d at 1205. Furthermore, I would find that Davis met his burden and should receive benefits for his physical disability. I would, therefore, affirm the decision of the Commonwealth Court.