J.G. FURNITURE DIVISION/BUR-
LINGTON and Liberty Mutual In-
surance Company, Petitioners

v.

WORKERS' COMPENSATION
APPEAL BOARD (KNEL-
LER), Respondent.

J.G. Furniture Division/Burlington
and Liberty Mutual Insurance
Company, Petitioners

v.

Workers' Compensation Appeal Board
(Kneller), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 23, 2004.

Decided Nov. 8, 2004.

Reargument Denied Jan. 5, 2005.

Katherine M. Mezzanotte, Philadelphia,
for petitioners.

Rodney D. Henry, Quakertown, for re-
spondent.

BEFORE: FRIEDMAN, Judge,
LEADBETTER, Judge, and KELLEY,
Senior Judge.

OPINION BY Judge FRIEDMAN.[1]

J.G. Furniture Division/Burlington (Em-
ployer) and Liberty Mutual Insurance
Company (Liberty Mutual) petition for re-

---

1. This case was reassigned to the opinion writer on August 9, 2004.

view of the September 25, 2003, order of the Workers' Compensation Appeal Board (WCAB), which affirmed the decision of the workers' compensation judge (WCJ) making Liberty Mutual liable for Willard Kneller's (Claimant) specific loss benefits based on Claimant's average weekly wage (AWW) as of September 6, 1984. We affirm in part and reverse in part.

Claimant sustained a work-related injury to his left index finger on January 21, 1976, and he received total disability benefits pursuant to a notice of compensation payable (NCP).[2] Employer's insurer at the time was Liberty Mutual.[3] On September 6, 1984, Claimant's left index finger was amputated due to circulatory problems.[4] Employer's insurer at that time was Federal Kemper Insurance Company (Kemper).[5]

On October 20, 1997, following extensive litigation on matters that are not relevant here, Employer and Liberty Mutual filed a petition to suspend or review benefits, alleging that Claimant's left index finger injury resolved into a specific loss as of September 6, 1984, the date of the amputation, and that Claimant was entitled to specific loss benefits based on his AWW on January 21, 1976.[6] On October 15, 1998, WCJ Peter E. Perry determined that Liberty Mutual was liable for specific loss benefits based on Claimant's AWW in 1976.[7]

Claimant appealed to the WCAB, arguing that, pursuant to *Roadway Express, Inc. v. Workers' Compensation Appeal Board (Siekierka)*, 708 A.2d 132 (Pa. Cmwlth.1998), his benefits should be based upon his AWW on September 6, 1984, the date his injury resolved into a specific loss.[8] The WCAB agreed, and, on June 9, 2000, the WCAB remanded the case for a calculation of the appropriate benefit rate.[9]

On October 24, 2000, at a hearing on Claimant's 1984 AWW, Liberty Mutual moved to join Kemper as a party.[10] WCJ Bruce K. Doman denied the motion, reasoning that to grant joinder would go beyond the WCAB's remand order.[11] WCJ Doman then found that Claimant's AWW on September 6, 1984 was $385.48, resulting in a weekly compensation rate of $256.99.[12]

Liberty Mutual appealed to the WCAB, arguing that, if Claimant's 1984 AWW applied, then Kemper is liable for Claimant's specific loss benefits and WCJ Doman erred in failing to allow the joinder of Kemper.[13] The WCAB agreed and remanded the case so that Kemper could be joined and so that WCJ Doman could de-

2. (WCJ Perry's 10/15/98 Findings of Fact, No. 1, R.R. at 3a.)

3. (WCJ Doman's 6/27/02 Findings of Fact, No. 1, R.R. at 25a.)

4. (WCJ Perry's 10/15/98 Findings of Fact, No. 1, R.R. at 3a; WCJ Doman's 11/21/00 Findings of Fact, No. 1, R.R. at 14a.)

5. (WCJ Doman's 6/27/02 Findings of Fact, No. 7, R.R. at 26a.)

6. (WCJ Perry's 10/15/98 op. at "Record," R.R. at 3a; O.R., 10/20/97 Petition to Suspend or Review Compensation Benefits.)

7. (WCJ Perry's 10/15/98 Order, R.R. at 4a.)

8. (O.R., Claimant's 11/13/98 appeal to the WCAB.)

9. (WCAB's 6/9/00 op. at 3–4, R.R. at 9a–11a.)

10. (O.R., 10/24/00 hearing, N.T. at 6.)

11. (O.R., 10/24/00 hearing, N.T. at 6–7.)

12. (WCJ Doman's 11/21/00 Findings of Fact, No. 3, R.R. at 14a.)

13. (O.R., Liberty Mutual's 12/13/00 appeal to the WCAB.)

termine which insurer was liable for the specific loss benefits.[14]

On remand, WCJ Doman held a hearing on the joinder of Kemper.[15] Kemper appeared at the hearing, presented evidence, argued that Liberty Mutual is liable for Claimant's specific loss benefits and received an opportunity to present additional evidence after the hearing.[16] Upon consideration of the matter, WCJ Doman denied joinder and ordered Liberty Mutual to pay Claimant's specific loss benefits based on his 1984 AWW.[17] Liberty Mutual appealed to the WCAB, which affirmed.[18] Liberty Mutual now petitions this court for review.

Liberty Mutual first argues that the WCAB erred in concluding that Claimant's specific loss injury occurred on September 6, 1984, and, thus, that Claimant's specific loss benefits must be calculated using Claimant's AWW as of September 6, 1984. We disagree.[19]

■ Section 306(c)(10) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 513(10), states that the compensation for the permanent loss of an index finger is sixty-six and two-thirds per centum of the claimant's "wages." Under section 309 of the Act, the term "wages" shall be construed to mean an employee's average weekly wage "at the time of the injury." 77 P.S. § 582. Thus, if Claimant's specific loss injury occurred in 1976, Claimant's specific loss benefits would be based on Claimant's AWW in 1976, but if Claimant's specific loss injury occurred in 1984, Claimant's specific loss benefits would be based on Claimant's AWW in 1984.

In *Roadway Express*, this court held that, where a claimant's eye is injured by trauma and there is a progressive diminution of the use of the eye which prevents the claimant from knowing that he had lost his eyesight completely for all practical intents and purposes, the specific loss injury occurred when a physician advised the claimant of the complete loss of the eye.

14. (WCAB's 1/30/02 op. at 2–3, R.R. at 19a–20a.)

15. (*See* O.R., 4/26/02 hearing transcript.)

16. (O.R., 4/26/02 hearing, N.T. at 4, 8, 15.)

17. (WCJ Doman's 6/27/02 op. at 5, R.R. at 27a.)

18. (WCAB's 9/25/03 op. at 5, R.R. at 34a.) We note that, in concluding that Liberty Mutual was liable for Claimant's specific loss benefits, the WCAB relied on the principles of res judicata and collateral estoppel. However, the WCAB's reasoning was flawed.

First, the WCAB stated that Liberty Mutual did not appeal the following finding from a 1987 adjudication involving a petition to set aside a final receipt: "The [circulatory] problems with the Claimant's left index finger, which ultimately resulted in [its] need to be amputated, were the result of the injury Claimant sustained on January 21, 1976." (O.R., WCJ Gould's 9/25/87 Findings of Fact, No. 9.) Although this finding establishes Liberty Mutual's liability for loss of earnings caused by Claimant's circulatory problems, it does *not* establish Liberty Mutual's liability for specific loss benefits.

Second, the WCAB stated that Liberty Mutual did not appeal a finding from a 1998 adjudication that Liberty Mutual "agreed to pay [Claimant's] specific loss benefits." (WCJ Perry's 10/15/98 Findings of Fact, No. 3, R.R. at 4a.) However, the 1998 adjudication *granted* Liberty Mutual's review petition. Thus, Liberty Mutual was not aggrieved by the adjudication and could not have appealed this finding. Moreover, the finding is incomplete; it does *not* state that Liberty Mutual agreed to pay Claimant's specific loss benefits *based on Claimant's 1984 AWW*.

19. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with law and whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

Here, Claimant's left index finger was injured in 1976, and, as in *Roadway Express,* there was a progressive diminution of the use of the finger due to circulatory problems. In 1983 and 1984, Clarence L. Freed, M.D., discussed with Claimant the possibility of a finger amputation.[20] Claimant was reluctant to undergo amputation because Claimant had the normal use of his finger during warm weather when his circulation was normal.[21] Nevertheless, Claimant agreed to the September 6, 1984, amputation because of the severe pain and numbness he felt in the cold weather.[22] Thus, Claimant did not lose the use of his finger completely for all intents and purposes until the amputation, which means that the specific loss injury did not occur until September 6, 1984. As a result, under sections 306(c)(10) and 309 of the Act, Claimant's specific loss benefits must be calculated using Claimant's AWW as of September 6, 1984.

Liberty Mutual next argues that, if Claimant sustained his specific loss on September 6, 1984, then Kemper, Employer's insurer in 1984, is responsible for payment of Claimant's specific loss benefits. We agree. Certainly, once the date of a specific loss injury has been established, the carrier at risk on the date the specific loss injury occurred is the responsible carrier. Indeed, we have found no law to the contrary. Therefore, because Kemper was Employer's insurer in 1984, Kemper is liable for Claimant's specific loss benefits.

Accordingly, we affirm the award of specific loss benefits based on Claimant's 1984 AWW, but we reverse the determination that Liberty Mutual is liable for those benefits.[23]

## ORDER

AND NOW, this 8th day of November, 2004, the order of the Workers' Compensation Appeal Board, dated September 25, 2003, is hereby affirmed in part and reversed in part, as set forth in the foregoing opinion.

## DISSENTING OPINION BY Judge LEADBETTER.

In this case involving the specific loss of a finger more than eight years after the incident causing the trauma, we are asked to determine whether the claimant's specific loss benefits should be calculated using the average weekly wage as of the date of the original injury or the date the injury resolved into a specific loss. While I believe that the majority has reached a fair and reasonable result, I also believe that to reach this result we must reconsider a substantial body of case law interpreting the term "injury," which this panel is not free to do on its own.

Our analysis must begin with the statutory provisions at issue. Compensation for the specific loss of an index finger is 66⅔ percent of a claimant's "wages" for 50 weeks. Section 306(c)(10) of the Workers' Compensation Act (Act),[1] 77 P.S. § 513(10). "Wages" is defined by the Act as the claimant's average weekly wage at the *time of the injury.* See Section 309 of the Act, 77 P.S. § 582. Thus, the critical inquiry turns on our interpretation of the term "injury" as used in Section 309.

20. (O.R., Dr. Freed's 5/8/85 dep. at 16, 19.)

21. (O.R., Dr. Freed's 5/8/85 dep. at 27.)

22. (O.R. Dr. Freed's 5/8/85 dep. at 21.)

23. We note that, although Kemper received notice of the briefing schedule that this court issued in this case, Kemper did not file a timely brief.

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4; 2501–2626.

Section 301(c) of the Act, 77 P.S. § 411, provides that:

(1) The terms "injury" and "personal injury," as used in this act, shall be construed to mean an injury to an employe, regardless of his previous physical condition, arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury; and wherever death is mentioned as a cause for compensation under this act, it shall mean only death resulting from such injury and its resultant effects, and occurring within three hundred weeks after the injury. The term "injury arising in the course of his employment," as used in this article ... shall include all other injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer, whether upon the employer's premises or elsewhere, and shall include all injuries caused by the condition of the premises or by the operation of the employer's business or affairs thereon. . . .

(2) . . . [W]henever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last date of employment. . . .

While the Act would appear to allow within the definition of "injury" subsequent physical effects which result from a workplace trauma, we have generally considered a new injury to occur only in the event of a new workplace trauma.[2] For instance, in determining which employer (or insurance carrier) is responsible for disability re-occurring after a claimant has successfully returned to work, we look to whether the claimant has suffered an aggravation or a recurrence of the initial injury. As we have noted:

**2.** As our Supreme Court has noted, the term "injury" is given no express statutory meaning. *Pawlosky v. Workmen's Comp. Appeal Bd. (Latrobe Brewing Co.)*, 514 Pa. 450, 459, 525 A.2d 1204, 1209 (1987); *City of Philadelphia v. Workers' Comp. Appeal Bd. (Williams)*, 578 Pa. 207, 851 A.2d 838, 846 (2004).

Further, it has variously construed "injury" in terms of the workplace event, the physical trauma occurring at the time of the workplace event, and also the subsequent physical manifestations of that trauma. "[I]n common speech the word 'injury,' as applied to personal injury to a human being, *includes whatever lesion or change in any part of the system produces harm or pain, or a lessened facility of the natural use of any bodily activity or capability. . . .*" Going further, this Court in *Creighan* went on to state that "[t]he word 'injury,' in ordinary modern usage, is one *of very broad designation,*" and that *"its common and approved usage extends to and includes any hurtful or damaging effect which may be suffered by anyone."*

*Pawlosky*, 514 Pa. at 459–60, 525 A.2d at 1209 [*quoting Creighan v. Firemen's Relief and Pension Fund Bd.*, 397 Pa. 419, 425, 155 A.2d 844, 847 (1959) (emphasis added by *Pawlosky*, further quotations omitted)], *cited with approval in Williams*, 578 Pa. at 220–21, 851 A.2d at 846. In *Metropolitan Edison Co. v. Workmen's Comp. Appeal Bd. (Werner)*, 553 Pa. 177, 184–87, 718 A.2d 759, 763–64 (1998), the Court stated:

The claimant's exposure to chemical fumes in the workplace clearly met the approved definition of injury.

. . . .

We agree with Met–Ed that normal working conditions, such as requiring an employee to work an eight-hour shift, do not constitute an injury under the Act. . . . It would be a gross distortion of the common and approved usage of the term "injury" to include within its meaning an employer's scheduling of an employee to work during an available eight-hour shift.

*See also Davis v. Workers' Comp. Appeal Bd. (Swarthmore Borough)*, 561 Pa. 462, 751 A.2d 168 (2000) (Nigro, J., dissenting).

[W]here a claimant has returned to work after his first injury and then a worsening of his ongoing medical impairment causes renewed disability, we have sought to determine whether the worsened condition results from a recurrence or an aggravation of the original injury. We have held that if a compensable disability results directly from a prior injury but manifests itself on the occasion of an intervening incident *which does not contribute materially* to the physical disability, then the claimant has suffered a recurrence. Conversely, where the intervening incident *does materially contribute* to the renewed physical disability, a new injury, or aggravation, has occurred. It is well settled in Pennsylvania that an "aggravation of a pre-existing condition" is deemed a new injury for purposes of workers' compensation law, thus, rendering the employer's current insurance carrier responsible for all medical and wage loss benefits arising from claimant's new injury. Alternatively, if a claimant has sustained a "recurrence of a prior injury," the insurance carrier responsible for employer's coverage at the time of claimant's original injury will be held liable for all disability benefits resulting from claimant's most recent injury.

*South Abington Township v. Workers' Comp. Appeal Bd. (Becker)*, 831 A.2d 175, 181 (Pa.Cmwlth.2003) (emphasis in original, citations omitted). Clearly, if each new physical manifestation or worsening of condition amounted to a new "injury," the distinction between aggravation and recurrence would be obliterated.

Critical to the issue at hand, due to the fact that a recurrence is not deemed to be a new injury, the calculation of benefits due upon the recurrence of disability is based upon the claimant's average weekly wage at the time of the original injury. *See Ringgold Sch. Dist. v. Workmen's Comp. Appeal Bd. (Belak)*, 96 Pa.Cmwlth. 111, 507 A.2d 876, 877 (1986); *Topps Chewing Gum, Inc. v. Workmen's Comp. Appeal Bd. (Zurek)*, 56 Pa.Cmwlth.425, 425 A.2d 57, 59 (1981). Conversely, if an aggravation or new injury is found to have occurred, then the calculation of benefits is based upon the average weekly wage at the time of the new injury. *Ringgold*, 507 A.2d at 877.

Based upon the same understanding of the term "injury" applied in the recurrence/aggravation cases, we held in *McDevitt v. Workmen's Comp. Appeal Bd. (Ron Davison Chevrolet)*, 106 Pa.Cmwlth. 207, 525 A.2d 1252 (1987), that the time period provided in Section 315 of the Act[3] (which requires filing of a claim petition within three years after the *injury*) begins to run at the time of the event (in that case, a workplace fall) which ultimately disabled the claimant, not the time when his physical condition had worsened to the point of becoming disabling. Applying these same principles, our Supreme Court in *City of Philadelphia v. Workers' Comp. Appeal Bd. (Williams)*, 578 Pa. 207, 851 A.2d 838 (2004), construed the term "injury" for purposes of Section 311 of the Act[4] (requiring notice to employer within 120 days of the occurrence of the *injury*) as follows:

> [I]n fixing the date of the occurrence of such an aggravation injury [carpel tunnel syndrome], it is apparent that the Commonwealth Court cases recognizing the distinct nature of such injuries are correct. Thus, where as here the credited medical evidence establishes that a cumulative trauma disorder was at issue,

---

**3.** 77 P.S. § 602.

**4.** 77 P.S. § 631.

and that conditions at work cause [a daily] *aggravation* of the disorder, notice must be deemed timely so long as it was given within 120 days of the last aggravation injury—which will usually

5. The only deviations from this judicial construction of "injury" have been in situations in which application of the common understanding of the term to the *limitation periods* of Sections 311 and 315 would create a patently unfair or absurd result or where, because of the cumulative nature of the injury, no specific date can be pinpointed on which the limitation period must begin to run. Thus, we have held that:

> Due to the progressive nature of hearing loss from cumulative exposure to noise, it is difficult to isolate the precise moment when a claimant suffers a complete hearing loss for all practical intents and purposes. To find a compensable hearing loss, there must be evidence showing that the gradual diminution of the work-related hearing loss reached that defined moment. Hence, this Court has held that for the purposes of Sections 311 and 315, a hearing loss becomes *compensable when a claimant is advised by a doctor that he or she has suffered a complete loss of hearing for all practical intents and purposes and that the loss is work-related.*

*Boeing Helicopter v. Workmen's Comp. Appeal Bd. (McCanney)*, 157 Pa.Cmwlth.76, 629 A.2d 184, 187 (1993) (citations omitted). Nonetheless, the following year we refused to follow this construct of the date of injury for purposes of calculating benefits, and instead returned to the general rule in cumulative trauma cases, the date of last exposure (which would necessarily be the last date of trauma). We stated:

> We note, however, that if we were to accept Employer's position that benefits are to be awarded based upon the rate of compensation in effect on the date that an employee is advised by his doctor that he suffers from a work-related hearing loss, an illogical and unjust result would occur for those employees who are unemployed or retired as of that date and thus have no earnings upon which to base an award. We, therefore, conclude that for the purpose of calculating benefits in hearing loss cases, we must look to the date of the last noise exposure.

*Westinghouse Electric Corp. v. Workmen's Comp. Appeal Bd. (Peterson)*, 164 Pa.

be the last day at work or the day where total disability resulted.

*Id.* at 223, 851 A.2d at 847–48 (emphasis added).[5]

Cmwlth.32, 641 A.2d 1277, 1281 (1994). The statutory framework for hearing loss cases has since been amended, and the date of injury is specifically defined in Section 306(c)(8)(ix) of the Act, 77 P.S. § 513(8)(ix). *See Socha v. Workers' Comp. Appeal Bd. (Bell Atlantic–Pa., Inc.)* 566 Pa. 602, 783 A.2d 288 (2001).

The other instance in which we have failed to apply the general rule is the case relied upon by claimant here, *Roadway Express, Inc. v. Workers' Comp. Appeal Bd. (Siekierka)*, 708 A.2d 132 (Pa.Cmwlth.1998). In *Roadway Express*, the claimant sustained a non-disabling work-related injury to his eye in April 1990. In March 1994, the claimant's doctor informed him that he had lost his eyesight in the injured eye for all intents and purposes. The claimant filed his claim petition one month later.

The court analogized the progressive loss of eyesight to the progressive loss of hearing, noting that there is often a gradual diminishment of the sense/faculty without any resultant disability and the claimant may not be aware of the extent and/or cause of the loss until so informed by a doctor. 708 A.2d at 135–36. Thus, applying the analysis employed in hearing loss cases, the court concluded that the claimant's petition was timely under Section 315 because it was filed within three years of the date that he was informed that his injury had progressed to the complete loss of his eyesight. *Id.* at 136. The court noted that "[t]o hold otherwise would produce an absurd result because Claimant had no right to file a petition for compensation until his medical problem involving his eyesight resolved itself by way of becoming a specific loss, because he had suffered no disability prior thereto." *Id.* Significantly, however, the WCJ awarded benefits based upon the claimant's average weekly wage at the time the trauma to the eye initially occurred. On appeal, the Board held that the claimant's average weekly wage at the time his doctor informed him of the loss should be used. This court declined to address which rate should properly be used because we concluded that the Board erred in raising the matter *sua sponte. Id.* at 137. Nothing in our deci-

In many ways, claimant's situation in the present case is strongly analogous to a recurrence of a prior injury. The WCJ found, and Liberty Mutual never seemed to dispute, that the amputation was the direct result and natural progression of the 1976 injury. If the progression of claimant's physical symptoms had led to another period of loss of earnings, established law would mandate that claimant's benefits be calculated based upon his 1976 average weekly wage, rather than the wages he was earning at the time his disability recurred. The same is true if the disability arising from the workplace trauma had been delayed. The fact that claimant's injury resolved into a specific loss (with no loss of earnings following his recovery from surgery) should not put him in a better position than the claimant whose injury causes a recurrence or delayed manifestation of disability.

I have no quarrel with a rule which would look to the average weekly wage at the time a change in physical condition which "naturally results" from the workplace trauma gives rise to a new or renewed claim; this would, I believe, be entirely consistent with the Act. However, such a rule should apply to all similarly situated claimants, not just those who suffer specific losses.

sion suggests that the date of injury analysis applied to the Section 315 limitations issue should govern the date of injury for purposes of determining the rate of compensation, and we see nothing in this case, nor in the nature of specific loss claims as a class of cases, which would necessitate a deviation from the general understanding of the term "injury" in this regard.

Limitations provisions pose unique problems in the context of delayed physical manifestation of trauma, and the very limited exceptions created to deal with those problems in certain cases must be viewed in that light.