**LANCASTER GENERAL HOSPITAL,**
Petitioner

v.

**WORKERS' COMPENSATION APPEAL BOARD (WEBER–BROWN), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Nov. 13, 2009.

Decided Dec. 15, 2009.

Reargument Denied En Banc Feb. 5, 2010.

W. Jeffrey Sidebottom, Lancaster, for petitioner.

William B. Gregory, Lancaster, for respondent.

BEFORE: PELLEGRINI, Judge, FRIEDMAN, Senior Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Lancaster General Hospital (Employer) appeals from an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) granting the claim petition of Janice Weber–Brown (Claimant) in which she claimed a work-related eye injury resulting in blindness in her left eye and a cornea transplant. Finding no error in the Board's decision, we affirm.

Claimant worked in Employer's intermediate unit as a licensed practical nurse from 1979 to 1985. Sometime during 1979 or 1980, Claimant was cleaning the tracheotomy of a patient infected with the herpes simplex virus (HSV) when the patient coughed causing sputum to spray in Claimant's left eye. She proceeded to Employer's emergency room to have her eye flushed, was given antibiotics, and was told to see her eye doctor. Approximately two weeks later, Claimant's eye ached, swelled and her vision began to blur, so she returned to the emergency room. As a result of this visit, Claimant believed she contracted an HSV infection in her left eye.

The infection in Claimant's eye recurred numerous times over the following years and each time she received treatment, the symptoms would dissipate and her vision would eventually improve. However, the infection recurred in October 2006 and did not improve or respond to treatment. By February 2007, Claimant had lost vision

completely in her left eye. She sent a letter to Employer dated March 9, 2007, giving the background of her employment, explaining the incident with the tracheotomy patient, her history of recurrent flare-ups, and her deteriorating condition. In May 2007, Claimant underwent a cornea transplant and was off work for three weeks.[1] Claimant filed a claim petition alleging loss of the use of her left eye as of March 8, 2007, due to exposure to HSV while in the course of her employment. Employer filed an answer denying the allegations.

Before the WCJ, Claimant testified that she worked for Employer as a licensed practical nurse for approximately six years. She could not remember the exact date of the incident, but stated that at some point during 1979 or 1980, she was cleaning the tracheotomy of a patient infected with HSV when the patient coughed and sputum sprayed in her left eye. She stated that she immediately reported the incident to her charge nurse who directed her to Employer's emergency room where her eye was flushed and she was given antibiotics. However, Claimant alleged that two weeks later, her eye ached, swelled, was red and her vision began to blur so she returned to the emergency room. After that visit, Claimant believed she had contracted an HSV infection in her eye due to the above spraying incident. She testified that she again notified her charge nurse as well as the day supervisor, June Stum, of the infection.

Claimant testified that at Employer's direction, she treated three to four times at the emergency room. She was not billed for these visits and understood that Employer was paying for the treatment. The infection in her eye recurred several times

for which she treated with her regular eye doctor, William Spitler, III, M.D. (Dr. Spitler), until he referred her to Barton L. Halpern, M.D. (Dr. Halpern) in 1985. Claimant testified that the eye infection recurred several times over the years, with her vision becoming cloudy and her eye swelling, and that the longest period she went without an active infection was six to seven years. She testified that the infection surfaced again in October, 2006, that it did not respond to treatment, and that she lost vision in her left eye completely in February 2007. She reported her loss of vision to Employer's workers' compensation office at that time. Dr. Halpern performed a cornea transplant in February 2007, but the transplant had not improved her vision. At the present time, Claimant could only see light and colors with her left eye, her vision was blurry and she could not read with that eye.

Marcia Goss (Nurse Goss), a registered nurse who worked in Employer's intermediate unit from June 1979 to June or July 1980, also testified. Nurse Goss was Claimant's supervisor and she testified that there was a patient infected with HSV on their unit during that time period. She remembered Claimant's incident quite clearly because it was unusual to have a chronic ventilation patient on the intermediate unit. She testified that after the incident, Claimant's eye was red, swollen and irritated, that she told her to treat at the emergency room, and that Claimant later informed her that she had contracted an HSV infection in her eye. Claimant also presented the testimony of Beverly Earhart (Earhart), a nurse's aide who worked on the intermediate unit beginning in 1980 during the same shift as Claimant and Nurse Goss. Earhart corroborated the

---

1. This was the first period of disability that Claimant suffered as a result of her eye infection. At that time, Claimant was employed as a nurse by The Heart Group for whom she continues to work on a part-time basis, earning $21 per hour.

testimony of Goss that there was a chronic ventilation patient with HSV on their unit in early 1980, and that they rarely had such patients in the intermediate unit. She also testified that Claimant's eye became infected at that time and that she complained of pain.

Henry Canello (Canello), Employer's Director of Benefits, testified that in response to Claimant's March 9, 2007 letter, he had his department search the hospital records but they did not find any records relating to this incident, Claimant's emergency room treatment, or to a patient infected with HSV. However, Canello admitted that while Employer retained some records from 1979 and 1980, he could not attest that they were complete.

Teresa Yost (Yost), benefits administrator in Employer's Human Resource Department, also testified. She has worked for Employer for 33 years and was the benefit clerk from 1979 to 1982. She testified that during the timeframe of Claimant's incident, that when an employee was injured on the job, she would either provide the emergency room with an injury report or the emergency room would have the employee complete one. Once it was determined that the injury was work-related, the hospital would write off the emergency room charges and would pay any bills the employee incurred for outside treatment. Yost also testified that she maintained a log of the reported work injuries, and when reviewing the records from the hospital, she was unable to find an injury report or any hospital bills regarding Claimant's alleged incident. However, Yost admitted that her records were not complete as she could only find logs from March through September 1980.

Claimant also presented the deposition testimony of Dr. Halpern, which indicated that he first examined Claimant in August 1985. At that time, Dr. Halpern noted that she had swelling of the left cornea, consistent with HSV, and that she stated that she first contracted HSV five years prior.[2] Dr. Halpern treated Claimant intermittently with steroids and antiviral medication for her HSV flare-ups. Claimant would improve only to later suffer another flare-up. He indicated that Claimant's testimony was consistent with her suffering an initial infection soon after she was sprayed in the face with sputum from the tracheotomy patient and suffering recurring secondary infections thereafter. Dr. Halpern indicated that Claimant's vision failed to improve after the October 2006 recurrence, and he diagnosed Claimant as having suffered a dense vascularized corneal scar in her left eye related to chronic inflammation due to an HSV infection. In March 2007, he discussed with her the possibility of a cornea transplant. By May 16, 2007, Claimant's vision was 20/200, which qualified as legally blind for tax purposes, and Dr. Halpern performed Claimant's cornea transplant on May 22, 2007. Despite the transplant, Claimant's vision had not improved, and Dr. Halpern indicated that while her new cornea was clear, HSV could affect other tissues in the eye beyond the cornea. On cross-examination, Dr. Halpern admitted that HSV was very common in the population and could be transmitted through kissing, skin or mucous contact and that it was a common reason for cornea transplants.

Employer presented the deposition testimony of Kristen Hammersmith, M.D. (Dr. Hammersmith). Dr. Hammersmith testified that HSV was very common and that

---

**2.** Dr. Halpern's initial history did not specifically mention that this was a work-related injury.

after a person was infected, it becomes latent and could cause recurrences throughout the person's lifetime. She testified that common symptoms of HSV were vesicles on the skin, swelling, light sensitivity, redness, poor vision and a feeling as if something was in the eye. She also stated that only one to six percent of HSV patients knew when they were initially infected. Dr. Hammersmith evaluated Claimant on January 21, 2008, and reviewed Dr. Halpern's records. Claimant provided a history of the spraying incident in which she denied vesicles or redness of the eye, but indicated she experienced blurred vision, drooping of her eyelid and a feeling that something was in her eye. Dr. Hammersmith agreed that Claimant's symptoms and recurring pattern of blurred vision were consistent with HSV infection and that Claimant underwent a cornea transplant because of scarring from HSV infection. However, she believed that it was only possible and not likely that the spraying incident while Claimant was cleaning the patient's tracheotomy was the actual source of her infection. Claimant's report of poor vision after the spraying incident, without any redness or vesicles on the skin, was more typical of a secondary or recurrent infection and was not typical of initial exposure to HSV, although she agreed that it would depend upon where the herpes was attacking. Dr. Hammersmith also admitted that it was difficult to determine whether the spraying incident was Claimant's initial exposure without reviewing her initial treatment records, which could not be located.

The WCJ granted Claimant's claim petition finding that her left eye was initially infected with HSV in February 1980 during the course of her employment, and that she suffered a permanent and complete loss of use of her left eye as a result of this work-related incident entitling her to benefits pursuant to Section 306(c) of the Workers' Compensation Act (Act).[3] Claimant's left eye did not materially contribute to her overall vision, even in conjunction with her right eye. He found that Claimant was initially infected while cleaning the tracheotomy of a patient infected with HSV, that she suffered periodic flare-ups which caused scarring of her cornea, and that this eventually necessitated a cornea transplant. In addition, the WCJ found that Claimant provided Employer with timely notice of her initial HSV infection in 1980, and that it was not disputed that she notified Employer of her loss of sight in March 2007.

The WCJ found the testimony of Claimant credible based upon her demeanor, comportment, consistency and the fact that her description of the incident was corroborated by the testimony of Nurse Goss and Earhart. The WCJ found the testimony of Dr. Halpern credible and rejected the testimony of Dr. Hammersmith because she based her opinion on the fact that most patients could not identify the exact point that they were infected with HSV, but that Claimant was very specific about the spraying incident in this case. Also, Dr. Hammersmith admitted that her opinions were handicapped due to the lack of medical records regarding the initial infection. While Claimant did not indicate during Dr. Hammersmith's examination that her eye was red after the initial incident, Claimant testified that she did have redness after the initial exposure and this was corroborated by Nurse Goss.

The WCJ arrived at the February 1980 timeframe for the spraying incident based upon the following: (1) Claimant testified that the incident occurred in either 1979 or 1980; (2) Earhart began working for Em-

---

3.  Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 513.

ployer in February 1980; (3) Nurse Goss terminated her employment with Employer in June or July of 1980; and (4) Yost was only able to obtain her employee injury logs beginning in March 1980. Given the timeframes of employment and the fact that Yost's logs did not mention Claimant's injury, the WCJ concluded the incident must have occurred in February 1980. However, the WCJ also found that Claimant's actual date of injury was May 16, 2007, the date Dr. Halpern advised her that the scarring of her cornea had progressed to the point where she needed a transplant. He also found that Claimant never regained vision in her left eye after this flare-up and that her vision had not significantly improved since the transplant. Because the date of injury was May 16, 2007, Claimant's compensation was calculated based upon her average weekly wages at that time, and she was awarded compensation at the rate of $389.50 per week for 275 weeks. The WCJ also awarded her a healing period of 10 weeks. Employer appealed to the Board which affirmed, and this appeal followed.[4]

■ On appeal, Employer argues that the WCJ's decision that Claimant's specific loss of sight in her left eye was a result of work-related HSV exposure was not supported by substantial evidence. According to Employer, the medical evidence shows that Claimant's current poor vision was not related to her HSV exposure, as both Dr. Halpern and Dr. Hammersmith testified that Claimant's cornea transplant appeared to be a success and that they did not know why she was still unable to see with her left eye. We disagree.

Dr. Halpern testified that Claimant's loss of vision in her left eye was due to a densely vascularized corneal scar related to chronic, recurrent inflammation from her HSV infection. Dr. Hammersmith agreed that this was the reason for the cornea transplant and that Claimant's loss of vision was the result of an HSV infection. Neither physician treated Claimant in the emergency room for the initial spraying incident or during her primary infection and neither was able to review her medical records as they were never found. However, Claimant provided consistent statements about the spraying incident and her initial infection when relaying her medical history to both physicians, during her testimony before the WCJ, and in her letters to Employer. The WCJ found her testimony to be credible. Claimant's account was also corroborated by two other nurses working in the intermediate unit at the time, one of whom was a supervisor and who testified that Claimant notified her promptly about the incident and the ensuing infection. Simply because Employer's records, which it admits were not complete, did not contain documentation of the spraying incident or Claimant's emergency room visit from almost 30 years ago does not prove the incident did not occur or that Claimant was not exposed to HSV during her employment. There was more than enough evidence as a reasonable mind might accept as adequate to support the conclusion in this case that Claimant's loss of sight was the eventual result of work-related exposure to HSV. In addition, Employer failed to offer evidence of any other occasion upon which Claimant could have been infected with HSV, and Dr. Hammersmith failed to provide an alternative reason for Claimant's current vision loss.

4. Our review of a decision of the Board is limited to determining whether errors of law were made, constitutional rights were violated or whether the record supports the necessary findings of fact. *Ward v. Workers' Compensation Appeal Board (City of Philadelphia)*, 966 A.2d 1159 (Pa.Cmwlth.2009).

■ Employer also argues that the WCJ erred as a matter of law in finding a compensation rate of $389.50 based upon Claimant's average weekly wages in May 2007. The WCJ determined Claimant's date of injury was in 2007, and it is undisputed that Claimant has not worked for Employer since 1985. Section 309(d.1) of the Act, 77 P.S. § 582(d.1), provides as follows:

> If an employee has not been employed by the employer for at least three consecutive periods of 13 calendar weeks in the 52 weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by 13 the total wages earned in the employ of the employer for any completed period of 13 weeks immediately preceding the injury and by averaging the total amount earned during such periods.

Because Claimant did not maintain an employment relationship with Employer during the three consecutive periods of 13 calendar weeks preceding the injury, Employer argues that the above section governs. The WCJ should not have used Claimant's current earnings in computing the compensation due but her average weekly wage in 1980, the time of the incident. Alternatively, Employer argues that the average weekly wage should be zero since Claimant no longer worked for Employer as of the date of injury.

However, neither of Employer's arguments represent the appropriate test. The Act defines wages in terms of a claimant's weekly pay "at the time of the injury." 77 P.S. § 582. This Court has repeatedly held that "in specific loss cases under Section 306(c) of the Act, 77 P.S. § 513, the date of the injury is the date when the claimant is notified by a doctor of the loss of use of the member or faculty for 'all practical intents and purposes' and that the injury is job related in nature."

Roadway Express, Inc. v. Workmen's Compensation Appeal Board, 708 A.2d 132 (Pa.Cmwlth.1998) (citing Eddy v. Workmen's Compensation Appeal Board (Bell Transit, Inc.), 130 Pa.Cmwlth. 306, 568 A.2d 279 (1989)).

We addressed this very issue in J.G. Furniture Division/Burlington v. Workers' Compensation Appeal Board (Kneller), 862 A.2d 689 (Pa.Cmwlth.2005). In that case, the claimant injured his left index finger in a work-related accident in 1976. He suffered progressive diminution of the use of his finger due to circulatory problems over the next several years and finally agreed to have the finger amputated in 1984 due to severe pain and numbness. We agreed that while the initial accident occurred in 1976, the claimant did not completely lose the use of his finger for all intents and purposes until it was amputated. Therefore, the specific loss injury did not occur until the claimant's finger was amputated, and we determined his compensation had to be calculated using his average weekly wage as of the date of the specific loss injury.

The WCJ correctly determined that Claimant's date of injury in this case was May 16, 2007, the date Dr. Halpern informed her that the scarring of her cornea had progressed to the point where she needed a cornea transplant. Prior to that point, every time Claimant suffered a flare-up, her symptoms would subside after treatment and she would regain her vision. This cycle repeated itself for over 25 years. However, on this last occasion, the infection did not respond to treatment and Claimant never regained her vision. Claimant could not possibly have known prior to this date that she had lost her sight for all practical intents and purposes; therefore, the WCJ correctly determined the date of Claimant's specific loss injury was May 16, 2007, and her compensation

rate must be based upon her average weekly wages at that particular time.

Employer's argument that Claimant's claim petition was not filed within the appropriate statute of limitations is also without merit. Section 315 of the Act, 77 P.S. § 602, provides for a three-year statute of limitations stating that "In cases of personal injury all claims for compensation shall be forever barred ... unless within three years after the injury, one of the parties shall have filed a petition as provided in article four hereof." While it is true that Claimant was initially infected with HSV almost 30 years ago, and that the recurrent HSV infections led to her current loss of vision, the date of exposure is irrelevant—the claim petition must be filed within three years of Claimant's *injury*. *See Roadway Express,* 708 A.2d at 135. Because the WCJ properly determined that Claimant's specific loss injury did not occur until May 16, 2007, her claim petition was filed well within the statute of limitations.

Finally, Employer argues that the WCJ's award of benefits for a healing period was not supported by the evidence and was erroneous as a matter of law. However, because Employer failed to raise this argument before the Board, the issue is waived. *Roadway Express,* 708 A.2d at 137 (citing *USX Corp. v. Workmen's Compensation Appeal Board (McDermott),* 152 Pa.Cmwlth. 174, 618 A.2d 1150 (1992)).

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this 15th day of December, 2009, the July 7, 2009 order of the Workers' Compensation Appeal Board at No. A08–2202 is affirmed.