718 A.2d 759

**METROPOLITAN EDISON COMPANY, Appellant,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD and Stephen C. Werner, Appellees.**

Supreme Court of Pennsylvania.

Argued Dec. 10, 1996.

Decided Sept. 30, 1998.

---

178

Daniel E.P. Bausher, Reading, for Metropolitan Edison Co.

Jonathan F. Ball, Philadelphia, Amicus Curiae for appellants.

Donald F. Smith, Jr., Reading, for Stephen C. Werner.

Norman R. Haigh, Secretary, for appellees.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE and NIGRO, JJ.

## *OPINION*

ZAPPALA, Justice.

Metropolitan Edison Company (Met–Ed) appeals from the order of the Commonwealth Court affirming the Workmen's Compensation Appeal Board's order awarding partial disability benefits to Stephen C. Werner. We find that the Commonwealth Court erred and reverse.

Stephen Werner began his employment with Met–Ed in 1967, performing several different jobs until he became an assistant system load dispatcher in March of 1976. He was promoted to system load dispatcher in March of 1985 and continued in that position until December 1990. As a system load dispatcher, Werner oversaw the operation of Met–Ed's electrical system, including the scheduling of generation and loading of transmission and distribution lines and substations.

Werner's work schedule throughout his employment history typically consisted of rotating shifts. The shifts consisted of three time periods: 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. (the midnight shift). As a system load dispatcher, he worked rotating shifts set on a six-week rotation pattern. A shift differential in pay was built into Werner's salary, so that he received a base rate of pay plus an additional amount per hour for the second shift, the midnight shift and Sundays.

Although Werner had worked rotating shifts for over twenty years of his employment with Met–Ed, he decided in 1990 to seek a position with the company that did not require a change in shifts because he was having trouble sleeping during

the day. Werner began to experience sleeping problems, diarrhea and headaches in September of 1988. He found that the headaches were more severe during and after the midnight shift, although there was less activity required for the job during that shift.

Werner discussed his problems with his supervisor and expressed his dissatisfaction with the shift work schedule. Werner encouraged his fellow dispatchers to request that the schedule be changed. Met–Ed conducted a shift-work survey and held several meetings among the dispatchers to determine whether the dispatchers themselves could decide on an alternative to rotating shifts. In June of 1990, the dispatchers decided that the existing rotating shift schedule was the most effective and best way to operate the schedule, and Met–Ed maintained the schedule as before.

After that consensus was reached by the dispatchers, Werner voluntarily quit his position as a system load dispatcher on December 10, 1990 and took a day shift janitorial position with Met–Ed at a lesser rate of pay. Two weeks later, he bid into another job as a utility man second class, which paid $12.73 per hour. Werner later filed a claim petition seeking benefits under the Workers' Compensation Act, 77 P.S. § 1 et seq., alleging that the cumulative physical stress of performing rotating shift work for 21 years resulted in diarrhea, headaches and digestive problems which prevented him from performing his prior occupation of system load supervisor. He sought partial disability benefits from December 10, 1990, based upon the reduction in his rate of pay after quitting his job as a system load dispatcher.

During the hearing on his claim petition, Werner testified that he began to experience sleep problems, diarrhea and headaches in September of 1988, and that his headaches were more severe during and after the midnight shift. Werner had consulted his family physician, who prescribed sleeping pills for when he worked the midnight shift. Werner testified that his problems had not interfered with his ability to perform his job, and that he had not missed any time from work between

September 1988 and December 9, 1990 because of his problems. The problems ceased when he changed jobs.

Werner introduced the deposition testimony of Dr. Gary Richardson, a board certified physician in internal medicine and endocrinology who had been involved in studies of the human biological clock. Dr. Richardson reviewed Werner's medical records, but did not consult with Werner or conduct a sleep study or any examination of Werner. In response to a hypothetical question, Dr. Richardson diagnosed Werner as suffering from a constellation of symptoms referred to as shift work maladaptation syndrome.

Dr. Richardson testified that shift work maladaptation syndrome is a consequence of a person's inability to adapt to a shift work schedule. He distinguished shift work maladaptation syndrome from diseases and defects, stating

...anything that prevents an individual from adequately sleeping during the day or as required by the shift schedule will cause shift work maladaption [sic] syndrome if allowed to progress for years or months or in some cases even weeks.

We have documented or demonstrated that some people sleep poorly on shift schedules because of unusual features of their circadian clocks. Some people sleep poorly on day shift because of the inevitable consequences of aging. Some sleep poorly on the day shift because of co-existence of some other disease or problem. Some probably for a variety of more mundane reasons. The data available do not allow us to be specific about Mr. Werner, but the outcome is fairly specific and recognizable. Something is preventing adequate sleep on the day shift or on the shift schedule as you outlined it and that consequence is chronic sleep deprivation and shift work maladaption [sic].

R. 246a–247a.

Dr. Richardson further testified that human physiology has adapted to make individuals active when there is light, and that bodily functions are optimized for daytime function. He indicated that the human body clock will always have a

daytime orientation due to exposure to sunlight by day and darkness by night. Dr. Richardson stated that research suggests there are "no real night people," merely a variation among individuals' abilities to adapt. He considered the age of an individual to be a relevant factor, with the prevalence of shift work maladaptation syndrome increasing with age. Dr. Richardson observed, however, that no data was available to predict who would be able to adapt to working at night and who would be unable to adapt.

Met–Ed introduced evidence that Werner's wife had been diagnosed with cancer during the period of time that Werner complained of difficulties with sleeping. The deposition testimony of Dr. Paul Levy, a physician who was board certified in internal medicine and gastroenterology, was also submitted. Dr. Levy opined that Werner's rotating shift work did not cause his abdominal discomfort, diarrhea and headaches.

The referee accepted the expert opinion of Dr. Richardson, and concluded that Werner had proved by sufficient, competent evidence that he had sustained a work-related injury in the nature of shift work maladaptation syndrome which resulted in partial disability beginning on December 10, 1990. Werner's claim petition for partial disability benefits was granted. The Workmen's Compensation Appeal Board affirmed.

On appeal before the Commonwealth Court, Met–Ed presented the issue of whether shift work maladaptation syndrome is a compensable injury under the Workers' Compensation Act and, if so, whether the applicable burden of proof is that for a physical injury or a psychic injury. The court concluded that the interruption in the circadian rhythm was a physical injury, and that the application of the physical injury burden of proof was appropriate because Werner did not plead the existence of anxiety or psychic problems giving rise to physical problems. The order of Workmen's Compensation Appeal Board was affirmed.

We granted Med–Ed's petition for allowance of appeal limited to the issues of (1) whether shift work maladaptation syndrome is a compensable injury under the Worker's Com-

pensation Act; and (2) whether the proper burden of proof was applied in the tribunals below. Met–Ed argues that shift work maladaptation syndrome, based solely upon the scheduling of work, is not a compensable injury. We agree.

■ The scope of appellate review in workers' compensation proceedings is limited to a determination of whether constitutional rights have been violated, an error or law has been committed, or any findings of fact are supported by substantial evidence. *Volterano v. Workmen's Compensation Appeal Board*, 536 Pa. 335, 639 A.2d 453 (1994).

■ We begin our analysis, as did Met–Ed, by noting that the initial inquiry that must be answered is what is the "injury" which underlies Werner's claim for partial disability benefits. When the claim is examined closely, it becomes evident that it is based upon Met–Ed's scheduling of system load dispatchers on the midnight shift. For the following reasons, we decline to find that scheduling an employee to work a night shift constitutes an injury under the Workers' Compensation Act.

The terms "injury" and "personal injury" are defined under the Act "to mean an injury to an employe, regardless of his previous physical condition, arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury...." 77 P.S. § 411(1). The current definition expanded the concept of injury which existed prior to the 1972 amendment of the Act. Prior to the amendment, benefits were provided only for injury or death resulting from an "accident" in the course of employment; the term "injury" was defined "to mean only violence to the physical structure of the body, and such disease or infection as naturally result[ed] therefrom." 77 P.S. §§ 1, 411 (1915) (amended 1972).

In *Pawlosky v. Workmen's Compensation Appeal Board*, 514 Pa. 450, 525 A.2d 1204 (1987), we discussed the 1972 amendment to the original statutory definition of "injury."

A careful reading of the 1972 version of section 301(c) will reveal that, with the exception of the occupational diseases incorporated by reference, the word "injury" as there used is not itself actually defined. Section 301(c)(1) merely states that "[t]he terms 'injury' and 'personal injury,' as used in this act, shall be construed to mean an injury...." 77 P.S. § 411(1) (emphasis added). This direction does no more than state that an injury is an injury. Although the 1972 amendment effectively categorizes the circumstances under which an injury is compensable, the word "injury" itself is given no express statutory meaning, as it had prior to the 1972 revision. Thus, just as under the original 1915 Act the courts had to give meaning to the undefined term "accident," ... so must the courts now define the meaning of the term "injury" in section 301(c)(1). And, since the latter term no longer has a technical meaning, it must be interpreted according to its common and approved usage.

514 Pa. at 459, 525 A.2d at 1209 (citations omitted).

The issue presented in *Pawlosky* was whether a disability caused by the job-related aggravation of a pre-existing disease, which was not specifically designated as an occupational disease under the Act, was compensable pursuant to the general injury provision under 77 P.S. § 411(1). The claimant alleged that he had become disabled because he suffered from a lung infection and an asthmatic condition resulting from his exposure to chlorine fumes and other chemical solutions used at the brewery where he was employed. The referee found that the claimant had asthma, that his condition was aggravated by the fumes at his workplace, and that the claimant was totally disabled as a result. The referee denied the claim petition, however, on the basis that the claimant had failed to prove that he suffered from an occupational disease under the omnibus provision of section 108(n) of the Act, 77 P.S. § 27.1(n).[1] The Workmen's Compensation Appeal Board affirmed the referee's decision.

---

1. Section 108, 77 P.S. § 27.1, identifies particular diseases that fall within the term "occupational disease" for purposes of the Act. The omnibus provision, § 108(n), includes diseases which are not specifical-

The Commonwealth Court reversed, holding that the workplace aggravation of a pre-existing disease constituted an injury under the general injury provision of section 301(c) of the Act, 77 P.S. § 411(1), even if the exposure-type harm was not proven to be an occupational disease under section 108(n). On appeal to this Court, the employer argued that the claimant's right to receive worker's compensation for the aggravation of his asthmatic condition by irritants in the work environment required proof that the incidence of aggravation was substantially greater in his occupation than in the general population. The employer contended that the legislative intent was to define injury in terms of (1) the pre–1972 concept of accidental injury, and (2) the occupational disease definition.

We rejected the employer's argument, finding that a job-related aggravation of a pre-existing disease was not precluded from being an injury under the Act merely because the disease was not an occupational disease. The elements necessary to support an award of workers' compensation benefits are (1) that the injury arose in the course of employment, and (2) that the injury was related to that employment. Because the claimant's inhalation of the chemical fumes introduced into his work environment aggravated his asthmatic condition and caused him to suffer an adverse physiological reaction, we concluded that the claimant had sustained an injury within the meaning of section 301(c)(1) of the Act, 77 P.S. § 411(1).

In determining that the claimant's exposure to chemical fumes which triggered an asthmatic attack was an injury, we noted that "since the term 'injury' no longer had a technical meaning, it must be interpreted according to its common and approved usage." 514 Pa. at 459, 525 A.2d at 1209. We accepted the broad definition of injury set forth in *Creighan v. Firemen's Relief and Pension Fund Board*, 397 Pa. 419, 155 A.2d 844 (1959), restating our observation in that case that,

ly enumerated under the Act within the term when a claimant demonstrates (1) exposure to the disease by reason of his employment, (2) that the disease is causally related to the industry or occupation, and (3) that the incidence of the disease is substantially greater in that industry or occupation than in the general population.

in common speech the word "injury," as applied to personal injury to a human being, includes whatever lesion or change in any part of the system produces harm or pain, or a lessened facility of the natural use of any bodily activity or capability.

514 Pa. at 459, 525 A.2d at 1209 (emphasis deleted). We noted further that *Creighan* interpreted the common and approved usage of the term to extend to and include "any hurtful or damaging effect which may be suffered by anyone." *Ibid.* The claimant's exposure to chemical fumes in the workplace clearly met the approved definition of injury.

In this case, Werner argues that shift work maladaptation syndrome constitutes an injury under the Act because he suffered from physical symptoms of headaches, diarrhea and loss of sleep. Werner contends that this satisfies the broad definition of injury discussed in *Pawlosky.* Met–Ed argues that Werner has not sustained an injury as defined under the Act because the stimulus underlying his physical complaints was the simple scheduling of work on a rotating shift basis. Met–Ed contends that scheduling an employee to work an eight-hour shift is a normal condition of employment, not a disease or physical harm.

We agree with Met–Ed that normal working conditions, such as requiring an employee to work an eight-hour shift, do not constitute an injury under the Act. Werner's argument confuses cause with effect. The cause, or stimulus, of Werner's physical complaints is the scheduling of the hours that Werner worked. Neither the condition of Met–Ed's premises nor the job functions of a system load dispatcher resulted in an injury to Werner. It would be a gross distortion of the common and approved usage of the term "injury" to include within its meaning an employer's scheduling of an employee to work during an available eight-hour shift.

The evolution of the definition of injury supports this conclusion. In its inception, a compensable injury under the Act required proof of an accident, of violence to the physical structure of the body, or disease or infection that naturally

resulted therefrom. The concept was later expanded so as to include injuries that were outside the scope of the pre–1972 version of the Act, such as injuries sustained because of exposure to hazardous or toxic conditions of the workplace, aggravation of pre-existing conditions resulting in physical injuries and work-related psychic injuries. The current version of the statute, however, does not define injury to include physical ailments that arise from normal working conditions such as eight-hour shifts.

■ Normal working conditions, in the nature of scheduling an employee to work a night shift, are not injuries for purposes of the Act merely because an employee undergoes physical or psychic reactions to those conditions. Although it is undisputed that Werner suffered from headaches, diarrhea and sleep loss, triggered by exposure to sunlight after working the midnight shift, the inquiry must focus upon whether the cause or stimulus of the physical complaints is an injury. Otherwise, all physical complaints would be considered injuries—an approach that has been rejected in psychic injury cases where the claimant suffered from physical ailments, as well as psychic problems in response to normal working conditions. Because Werner failed to establish that he sustained an injury under the Act, he may not recover partial disability benefits.[2]

Accordingly, the order of the Commonwealth Court is reversed.

NEWMAN, J., did not participate in the consideration or decision of this case.

---

2. Having found that shift work maladaptation syndrome is not an injury, we need not address Met–Ed's second issue of the applicable burden of proof.