**[J-28-2024] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| BRAD LEE HEROLD, AS EXECUTOR OF THE ESTATE OF WILLIAM L. HEROLD | : | No. 22 WAP 2023 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court entered February 16, 2023, at No. 998 CD 2021, Affirming the Order of the Court of Common Pleas of Allegheny County entered May 17, 2021, at No. GD-19-014532 and remanding. |
| v. | : | |
| | : | |
| | : | |
| UNIVERSITY OF PITTSBURGH - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION AND 3M COMPANY; ABB MOTORS AND MECHANICAL, INC. F/K/A BALDOR ELECTRIC COMPANY; ALLIED GLOVE CORPORATION; A.O. SMITH CORPORATION; ARMSTRONG INTERNATIONAL, INC.; AURORA PUMP COMPANY; BALTIMORE AIRCOIL COMPANY, INC.; BEAZER EAST, INC. INDIVIDUALLY AND AS SUCCESSOR TO KOPPERS COMPANY, INC., AND SUCCESSOR-IN INTEREST TO THIEM CORPORATION AND UNIVERSAL REFRACTORIES COMPANY; BMI REFRACTOR SERVICES, INC.; INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO PREMIER REFRACTORIES, INC., F/K/A ADIENCE, INC., SUCCESSOR-IN-INTEREST TO ADIENCE COMPANY, LP, AS SUCCESSOR TO BMI, INC.;BURNHAM BOILER CORPORATION N/D/B/A BURNHAM COMMERCIAL; BRYAN STEAM, LLC; CARRIER CORPORATION; CBS CORPORATION, A DELAWARE CORPORATION, F/K/A VIACOM INC., SUCCESSOR BY MERGER TO CBS CORPORATION, A PENNSYLVANIA CORPORATION, F/K/A WESTINGHOUSE ELECTRIC CORPORATION AND WESTINGHOUSE AIR BRAKE COMPANY; CLEAVER BROOKS, INC., F/K/A AQUA-CHEM, INC. D/B/A CLEAVER BROOKS DIVISION; | : | ARGUED:  April 10, 2024 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

CRANE CO.; DELVAL EQUIPMENT CORPORATION; DEZURIK, INC.; DONALD MCKAY SMITH, INC.; DUNHAM-BUSH, INC.; E.E. ZIMMERMAN COMPANY; EATON CORPORATION IN ITS OWN RIGHT AND AS SUCCESSOR TO CUTLER-HAMMER,INCORPORATED; EICHLEAY CORPORATION; FERRO ENGINEERING DIVISION OF ON MARINE SERVICES COMPANY, LLC, F/K/A OGLEBAY NORTON COMPANY;FLOWSERVE US, INC., INDIVIDUALLY AND AS SUCCESSOR TO BYRON JACKSON PUMPS, FLOWSERVEGESTRA, DURAMETALLIC CORP., ALDRICH PUMPS; CAMERON PUMPS; VOGT VALVES;WILSON-SNYDER CENTRIFUGAL PUMP; AND ROCKWELL VALVES; FMC CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO PEERLESS PUMP COMPANY, CHICAGO PUMP COMPANY, STERLING FLUID SYSTEM, INC. AND FORMER SUBSIDIARY CROSBY VALVE, INC.; FOSECO, INC.; FOSTER WHEELER CORPORATION; GARDNER DENVER, INC.; GENERAL ELECTRIC COMPANY; GRINNELL LLC; GOULDS PUMPS, LLC; I.U. NORTH AMERICA, INC.; AMERICA, INC. AS SUCCESSOR-BY-MERGER TO THE GARP COMPANY, F/K/A THE GAGE COMPANY, F/K/A PITTSBURGH GAGE AND SUPPLY COMPANY; IMO INDUSTRIES, INC., F/K/A IMO DELAVAL, INC., F/K/A TRANSAMERICAN DELAVAL, INC., F/K/A DELAVAL TURBIN, INC., DELAVAL TURBIN, INC., DEVALCO CORPORATION; INGERSOLL-RAND COMPANY; INSUL COMPANY, INC.; ITT CORPORATION, F/K/A ITT INDUSTRIES, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO BELL & GOSSETT DOMESTIC PUMP; J.H. FRANCE REFRACTORIES COMPANY; KRUMAN EQUIPMENT COMPANY; MALLINCKRODT US LLC, IN ITS OWN RIGHT AND AS

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

SUCCESSOR-IN-INTEREST TO IMCERA GROUP, INC., AND INTERNATIONAL GROUP, INC., AND INTERNATIONAL MINERALS AND CHEMICAL CORPORATION, AND AS SUCCESSOR-IN-INTEREST TO E.J. LAVINO; MINE SAFETY APPLIANCES COMPANY, LLC AS SUCCESSOR-IN-INTEREST BY MERGER WITH MINE SAFETY APPLIANCES COMPANY; MINNOTTE CONTRACTING CORPORATION; M.S. JACOBS & ASSOCIATES, INC.; NAGLE PUMPS, INC.; PEERLESS INDUSTRIES, INC.; POWER PIPING COMPANY; RILEY POWER INC.; SAFETY FIRST INDUSTRIES, INC., IN ITS OWN RIGHT AND AS SUCCESSOR-IN-INTEREST TO SAFETY-FIRST SUPPLY, INC.; SCHNEIDER ELECTRIC USA, INC. F/K/A SQUARE D COMPANY, IN ITS OWN RIGHT AND AS SUCCESSOR TO THE ELECTRIC CONTROLLER AND MANUFACTURING (EC&M); SPIRAX SARCO, INC.; SPX COOLING TECHNOLOGIES, INC., F/K/A MARLEY COOLING TECHNOLOGIES INC., F/K/A THE MARLEY COOLING COMPANY; TACO, INC. F/K/A TACO HEATERS, INC.; THE GOODYEAR TIRE & RUBBER COMPANY; THE GORDON-RUPP COMPANY; THE H.B. SMITH COMPANY, INC.; TRANE U.S. INC., SUCCESSOR-BY-MERGER TO AMERICAN STANDARD, INC., UNION CARBIDE CORPORATION; UNITED STATES STEEL CORPORATION; WARREN PUMPS LLC; WEIL-MCLAIN COMPANY, INC.; YORK INTERNATIONAL CORPORATION; AND ZURN INDUSTRIES, LLC F/K/A ZURN INDUSTRIES, INC. A/K/A ERIE CITY IRON WORKS

APPEAL OF: UNIVERSITY OF PITTSBURGH - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION

**JUSTICE WECHT**                                                    **DECIDED: JANUARY 22, 2025**

Both the Workers' Compensation Act and the Occupational Disease Act state that a claimant's occupational disease must manifest within certain time limits in order to be compensable. In *Tooey v. AK Steel Corp.*,[1] this Court was called upon to interpret the disease manifestation provision in the Workers' Compensation Act. The *Tooey* Court decided that the General Assembly intended to allow workers whose claims are barred by the manifestation requirement to sue their employers in tort. That decision was incorrect. It cannot be squared with the Occupational Disease Act ("ODA")'s parallel manifestation requirement, which clearly demonstrates that the legislature *did* intend to deny some occupational disease claimants both a civil and an administrative remedy.

Confronted today with the unambiguous provisions of the ODA that the *Tooey* Court overlooked, the Majority doubles downs (and expands) upon *Tooey*'s mistaken rationale. This is compounded error. Unlike the Majority, I would overturn *Tooey*'s flawed holding rather than reaffirm it. We are required to interpret the ODA as the General Assembly chose to write it, not as we might prefer it to be written. I respectfully dissent.

## I.     The Exclusive Remedy Provision of the Workers' Compensation Act

I begin with the Workers' Compensation Act's exclusivity provision, which immunizes employers from civil lawsuits brought by employees seeking damages for workplace injuries or occupational diseases. As an historical matter, exclusivity provisions were a key innovation (if not *the* key innovation) that led to the adoption of employer liability statutes in the early part of the twentieth century. Workers' compensation laws could not have passed state legislatures without industry support, and

---

[1]     81 A.3d 851 (Pa. 2013).

industry support was contingent upon the prospect of immunity from tort liability.[2]  This

century-old guarantee of immunity survives to this day in Section 303(a) of the Act, which

states that:

> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108.[3]

This Court traditionally has enforced the Act's exclusive remedy provision "with an

iron fist."[4]  In *Kline v. Arden H. Verner Co.*,[5] for example, we held that an injured worker

could not sue his employer in tort even though the injury that he alleged in his civil suit

---

[2]    David B. Torrey, *The Pennsylvania Workers' Compensation Act: History, Purposes, and Two Essential Narratives, in* THE CENTENNIAL OF THE PENNSYLVANIA WORKERS' COMPENSATION ACT 28 (Pa. Bar Ass'n 2015) ("[D]espite its genesis in a social reform movement, workers' compensation successfully unfolded because employers and insurance carriers favored the system, believed they would enjoy a net benefit from it, and had the influence to make it happen."); *id.* at 29 (quoting University of Pittsburgh history professor Roy Lubove, who noted that: "The social reformer may have justified workmen's compensation in terms of equity and social expediency, but the decisive consideration was that a major voluntary interest anticipated concrete, material advantages through the substitution of compensation for [tort] liability."); Price V. Fishback & Shawn Everett Kantor, *The Adoption of Workers' Compensation in the United States, 1900-1930*, 41 J. OF LAW & ECON. 305, 307 (stating that workers' compensation laws were "enacted so rapidly across the United States in the 1910s because most members of the key economic interest groups with a stake in the legislation anticipated benefits from moving from employers' liability to workers' compensation").

[3]    77 P.S. § 481(a) (footnotes omitted).

[4]    David B. Torrey, Lawrence D. McIntyre, Kyle D. Black, & Justin D. Beck, *Recent Developments in Workers' Compensation & Employers' Liability Law*, 53 TORT TRIAL & INS. PRAC. L.J. 703, 728-29 (2018) (noting that there is no intentional tort exception to Pennsylvania's exclusive remedy provision, making our law an anomaly among the states); *accord Poyser v. Newman & Co.*, 522 A.2d 548, 551 (Pa. 1987) (declining to exempt intentional torts committed by the employer from the law's exclusive remedy provision).

[5]    469 A.2d 158 (Pa. 1983).

(impotence) is not compensable under the Workers' Compensation Act.[6] *Kline* mirrored

an earlier decision from this Court holding that an injured worker could not file a tort suit

against his employer for an injury that resulted in the loss of his sense of smell and taste

but did not cause any statutorily compensable wage loss.[7] Given these holdings, it was

well understood prior to this Court's 2013 decision in *Tooey*, that "a common law action

is barred even if there is no specific recovery available under the auspices of the Act."[8]

## II.     The Disease Manifestation Requirement

As in other states, occupational disease claims in Pennsylvania have *always* been

subject to some kind of disease manifestation requirement.[9] Our original 1915 Workers'

Compensation Act did not include coverage for occupational diseases, because the law's

proponents were troubled by the prospect of "render[ing] employers liable in all cases,

with or without fault, for mere disease or ill health of their employee," which was seen at

the time as "much more radical and precedent-breaking than imputation of no-fault liability

---

[6]     *Id.* at 160-61.

[7]     *Scott v. C. E. Powell Coal Co.*, 166 A.2d 31, 34 (Pa. 1960) ("We have ruled that when an employee sustains injuries which bring him within the provisions of the Workmen's Compensation Act, the question as to what amount he is compensated depends on the provisions of the Act, and if that measure yields him nothing, the assumption is that he is nevertheless satisfied with his agreement.").

[8]     DAVID B. TORREY, ANDREW E. GREENBERG, & LEE FIEDERER, PENNSYLVANIA WORKERS' COMPENSATION LAW & PRACTICE § 10.18 (4th ed. 2021); *id.* § 1:36 ("[I]f the worker has a potential claim under the compensation act, but it is conclusively barred by a statute of limitations or other time limitation, then the immunity of the employer survives, and it is not liable at common law." (footnote omitted)).

[9]     David B. Torrey, *The Workers' Compensation Act, Its Amendments, and Interpretation: 1916-Present*, *in* THE CENTENNIAL OF THE PENNSYLVANIA WORKERS' COMPENSATION ACT, *supra* note 2, at 305 (noting that "[t]he O.D. provisions of the law have featured such statutes of repose since the 1930s"); *see, e.g.*, IOWA CODE § 85A.12 ("An employer shall not be liable for any compensation for an occupational disease . . . unless disablement or death results within three years in case of pneumoconiosis, or within one year in case of any other occupational disease, after the last injurious exposure to such disease in such employment.").

for injuries due to accidents."[10]  When occupational disease coverage eventually was added to the Workers' Compensation Act in 1937, the legislature included multiple provisions that rendered some occupational diseases non-compensable if they did not manifest within certain parameters.  Specifically, the law provided compensation only for disabilities occurring "within two years after the [claimant's] last exposure" in the "hazardous occupation in which he was employed."[11]  The statute also specified that compensation for silicosis and asbestosis in particular "shall be paid only when it is shown that the employee has had an aggregate employment of at least two years in the Commonwealth of Pennsylvania during a period of eight years next preceding the date of disability in an occupation having a silica or asbestos hazard."[12]

The Commonwealth's then-dominant coal companies, which viewed the 1937 legislation as overly generous to workers, challenged the law on constitutional grounds.[13]  In the resulting case, *Rich Hill Coal Co. v. Bashore*,[14] this Court struck down several of

---

[10]     Torrey, *supra* note 9, at 255 (quoting Alexander F. Barbieri, *Recent Reenactments of the Pennsylvania Workmen's Compensation Laws (Part II)*, 14 TEMP. L. Q. 151 (1940)).

[11]     Act of July 2, 1937, P.L. 2714, No. 552, § 6(b) (repealed).  As for fatal occupational disease claims, the 1937 law afforded compensation only when the worker's death occurred "within five years following [their] disability from such disease."  *Id.*

[12]     Act of July 2, 1937, P.L. 2714, No. 552, § 5 (repealed).

[13]     Among other arguments, the companies maintained that the law's "increase in the maximum compensation payable—[from] $12.00 to $18.00, with an attendant 62.5 percent increase in compensation insurance rates—was so great that the compensation payable was not 'reasonable' within the meaning and authority of the Constitution." Torrey, *supra* note 9, at 262; PA. CONST. art. III, § 18 (allowing the General Assembly to enact laws that require employers to pay "reasonable compensation" for workplace injuries and occupational diseases).

[14]     7 A.2d 302 (Pa. 1939).

the law's provisions and called into question the constitutionality of others on remand.[15] The General Assembly then repealed most of the 1937 law's liberal reforms by reenacting the original 1915 Workers' Compensation Act (thus removing disease coverage) and passing a standalone Occupational Disease Act of 1939. Like the 1937 legislation, the 1939 occupational disease law included a manifestation requirement specifying that compensation is available only for "disability or death resulting from occupational disease and occurring within four years after the date of [the worker's] last employment" in an industry or occupation where the disease is a hazard.[16] This four-year manifestation requirement survives in the Occupational Disease Act to this day.[17]

In 1972, the General Assembly re-added occupational disease coverage to the Workers' Compensation Act for claimants who were exposed to disease hazards after June 30, 1973.[18] This brought coverage for occupational diseases back into the Workers' Compensation Act for the first time since the ill-fated 1937 legislation. The General Assembly nevertheless opted to leave in place the separate Occupational Disease Act of 1939. Today, the two statutes exist in parallel, meaning that occupational disease

---

[15] Torrey, *supra* note 9, at 262 ("In an opinion based on *Lochner*-era constitutional thinking, the [*Rich Hill Coal*] Court ultimately held seven provisions of the law unconstitutional and remanded the case. On remand, a hearing was to be held for findings as to whether the increases in compensation and rates were so drastic as to be unreasonable and thus constitutionally invalid."); *see Rich Hill Coal*, 7 A.2d at 308 ("If compensation rates are fixed so high that capital does not reap a fair share of reward from these joint endeavors or if the rate is fixed so high as to wipe out or unduly encroach on that margin of a just return to which capital is entitled, the compensation rate is unreasonable and therefore the act prescribing it is invalid and unconstitutional.").

[16] Act of June 21, 1939, P.L. 566, No. 284, § 301(c) ("Wherever compensable disability or death is mentioned as a cause for compensation under this act, it shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry.").

[17] 77 P.S. § 1401(c).

[18] Act of Oct. 17, 1972, P.L. 930, No. 223.

claimants can choose whether to file their claims under the Workers' Compensation Act, the Occupational Disease Act, or both in the alternative.[19]

As with the 1937 and 1939 legislation, the 1972 amendments to the Workers' Compensation Act included a disease manifestation requirement. Specifically, Section 301(c)(2) of the Act stated (and still states) that:

> whenever occupational disease is the basis for compensation, for disability or death under this act, **it** shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease[.][20]

The intent behind this provision is no mystery. The legislature was apprehensive about creating a system that would effectively impose upon employers strict liability for all diseases suffered by their workers. Given this concern, the General Assembly initially did not include disease coverage at all within the Act. And when it finally expanded the law in 1937 to encompass occupational diseases, it purposely included manifestation requirements and other statutory limitations designed to cabin employer liability for occupational disease.[21] As with those now-defunct statutes, Section 301(c)(2)'s 300-

---

[19] *Pawlosky v. W.C.A.B. (Latrobe Brewing Co.)*, 525 A.2d 1204, 1210 n.9 (Pa. 1987) ("[T]he 1939 statute, The Pennsylvania Occupational Disease Act, remains unrepealed."); 77 P.S. § 1000 ("[A]ny person may pursue, in the alternative, a claim for compensation under this act and a claim for compensation under The Pennsylvania Occupational Disease Act.").

[20] 77 P.S. § 411(2) (emphasis added; footnote omitted).

[21] In addition to the two manifestation requirements already mentioned, the 1937 law also stipulated that compensation was unavailable for partial (as opposed to total) disability due to silicosis, anthraco-silicosis, or asbestosis. Act of July 2, 1937, P.L. 2714, No. 552, § 5(b) (repealed) ("Compensation shall not be payable for partial disability due to silicosis, anthraco-silicosis, or asbestosis."). The statute also capped employers' total liability to claimants suffering from those diseases at $3,600. *Id.*

week restriction similarly was intended to narrow the scope of employer liability.[22]  These manifestation requirements, in other words, reflect "the simple legislative judgment that employers are to be relieved of at least some of the liability which might possibly accrue, by means of an arbitrary time limit on the manifestation of disability-causing diseases."[23]

Although imposing a disease manifestation requirement may at first blush "seem anomalous in the context of legislation which provides, as one of its principal purposes, the *enhanced* possibility of recovery for injured workers," the 300-week restriction was actually an essential element of the grand bargain underlying the law.[24]  The provision demonstrates a legislative recognition that employers—which have sacrificed their common law defenses and face "almost certain liabilities" under the statutory scheme— are entitled to a defined time frame in which liability under the Act could potentially accrue.[25]  In light of the Act's far-reaching exclusive-remedy provision, it was widely understood prior to this Court's decision in *Tooey* that the legislature did not intend to allow claimants whose occupational diseases manifest beyond the 300-week period to

---

[22]     David B. Torrey, *Time Limitations in the Pennsylvania Workmen's Compensation and Occupational Disease Acts: Theoretical Doctrine & Current Applications*, 24 Duq. L. Rev. 978, 1013-14 (1986) ("The origins of legislative hostility towards compensation of *all* disease victims, discernible in these [manifestation] 'limitations,' can be traced to the earliest anxieties of the fathers of workmen's compensation concerning the compensation of diseases under the strict-liability of the new statutory scheme." (footnote omitted; emphasis in original)).

[23]     *Id.* at 1015.

[24]     *Id.* at 979 (emphasis in original).

[25]     *Id.* ("Having sacrificed its common law defenses, the employer faces increased and almost certain liabilities; it is thus reasonable that at least the time frame within which such liability may accrue is established clearly.").

sue their employers in tort.[26]   State and federal courts had so held, and this Court had declined to disturb the state rulings on appeal.[27]

### III.    *Tooey v. AK Steel Corp.*

In *Tooey*, this Court was presented with conflicting interpretations of the Workers' Compensation Act's 300-week disease manifestation requirement.   Specifically, the *Tooey* Court was asked to decide what the General Assembly meant when it used the word "it" in Section 301(c)(2) of the Act, which states:

> whenever occupational disease is the basis for compensation, for disability or death under this act, **it** shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease[.][28]

---

[26]     TORREY, GREENBERG, & FIEDERER, *supra* note 8, § 10.18 ("[A] pure 'occupational disease,' to be compensable, must manifest itself within 300 weeks of the employee's last exposure to the disease hazard.  This precluded many claims because of the delayed manifestation of asbestos-caused ailments.  Employee attempts to sue their employers in tort, when so barred, were consistently dismissed on the authority of *Kline*." (footnote omitted)); *id.* § 1:36 ("[I]f the worker has a potential claim under the compensation act, but it is conclusively barred by a statute of limitations or other time limitation, then the immunity of the employer survives, and it is not liable at common law.").

[27]     *See Sedlacek v. A.O. Smith Corp.*, 990 A.2d 801, 809 (Pa. Super. 2010), *allocatur denied*, 4 A.3d 1055 (Pa. 2010) (holding that a deceased worker's estate could not sue the worker's former employer in tort even though compensation was unavailable under both the Workers' Compensation Act and the Occupational Disease Act because of the statutory manifestation requirements); *Ranalli v. Rohm & Haas Co.*, 983 A.2d 732, 735 (Pa. Super. 2009), *allocatur denied*, 9 A.3d 631 (Pa. 2010) ("Simply because the injury is not compensable under the Act by virtue of a time limitation does not mean the workers' compensation bar may be overlooked."); *see also Weldon v. Celotex Corp.*, 695 F.2d 67, 72 (3d Cir. 1982) ("[T]he employer's immunity from tort liability continues even though the limitations period in the Act bars compensation for the employee."); *accord Papa v. Franklin Mint Corp.*, 583 A.2d 826, 826-27 (Pa. Super. 1990) ("The exclusivity provision is not rendered ineffective merely because the claimant-employee, in proceedings to recover workmen's compensation benefits, was unable to prove a compensable injury.").

[28]     77 P.S. § 411(2) (emphasis added).

The *Tooey* majority considered two possible interpretations of this language.  First, the word "it" could mean "compensation."  Understood this way, Section 301(c)(2) specifies that there is no compensation available for injuries that manifest outside of the specified time limit.  The other possibility is that the legislature intended for "it" to mean the Act itself.  In that case, Section 301(c)(2) provides that *the entire Act*—including the Act's exclusive remedy provision—does not apply to claims that are barred by the manifestation requirement, meaning that late-manifesting claims are cognizable in tort.

The *Tooey* Court concluded that "it" means the Act, such that the entire Act does not apply to diseases that manifest more than 300 weeks after the claimant's last exposure.[29]  Although it insisted that this conclusion flowed from the plain language of the statute, the *Tooey* majority focused almost entirely upon non-textual considerations, which the Court said that it was offering only "for purposes of argument."[30]  For example, the *Tooey* majority mentioned—no fewer than four times—the proposition that the Workers' Compensation Act should be construed liberally in light of the law's remedial

---

[29]     Although Section 301(c)(2) unambiguously states that the 300-week period begins "after the last date of employment in an occupation or industry to which [the worker] was exposed to" the hazards of the disease, our Court has abdicated its responsibility to enforce the statute's plain language.  We have held instead that the 300-week period should be measured from the date of *last exposure.  Cable v. W.C.A.B. (Gulf Oil/Chevron USA, Inc.)*, 664 A.2d 1349, 1351 (Pa. 1995) (OAJC) ("[I]t would be unfair to provide compensation to one employee but not another simply because the first employee was fortunate enough to remain with the same employer throughout his career.").  Needless to say, that decision abides by none of the traditional rules of statutory interpretation.

[30]     *Tooey*, 81 A.3d at 860 ("Assuming, for purposes of argument, that Employers' interpretation of Section 301(c)(2) also is reasonable, such that there exists an ambiguity, we turn, as the parties do in the alternative, to further principles of statutory construction." (internal citation omitted)); *compare id.* at 859 ("[T]he common and approved usage of the terms in Section 301(c)(2) clearly support Appellants' interpretation of the statute.), *with id.* at 859-65 (justifying the decision based upon the law's remedial purpose and the likely consequences of an alternative interpretation).

purpose.[31] The Court also agonized over "the consequences of" interpreting the Act to prohibit employees from filing common law tort suits, calling it "inconceivable" that the General Assembly intentionally would have left an entire class of injured workers "without any redress under the Act or at common law."[32]

Whether the *Tooey* majority could conceive of it or not, the General Assembly unquestionably intended for the Act's exclusive remedy provision to prevent workers whose occupational diseases manifest beyond the statutory time limit from suing their employers in tort. In some of the statutory interpretation cases that come before this Court, the legislature's actual intent is, practically speaking, unknowable. *Tooey* was not one of those cases. The 300-week manifestation requirement was intended to *limit* employers' liability for occupational diseases, not to shift some of that liability back into the civil tort system.[33] The *Tooey* Court's conception of the legislature's intent was simply wrong.

---

[31] *Id.* at 858 ("[T]he Act is to be liberally construed to effectuate its humanitarian objectives, and borderline interpretations are to be construed in the injured party's favor."); *id.* at 860 ("[T]he Act must be liberally construed to effectuate its humanitarian objectives."); *id.* 864-65 ("The dissent fails to acknowledge, however, as we have repeatedly emphasized, that the Act is remedial in nature and intended to benefit the worker, and, therefore, the Act must be liberally construed to effectuate its humanitarian objectives." (citation omitted)); *id.* at 865 ("[C]onsideration of the relevant factors set forth in 1 Pa.C.S.A. § 1921(c), particularly the remedial purpose of the Act and the consequences of both Employers' and Appellants' proposed interpretations, indicates the legislature did not intend the Act to apply to claims for disability or death resulting from occupational disease which manifests more than 300 weeks after the last occupational exposure.").

[32] *Id.* at 864 ("It is inconceivable that the legislature, in enacting a statute specifically designed to benefit employees, intended to leave a certain class of employees who have suffered the most serious of work-related injuries without any redress under the Act or at common law.").

[33] PBA Workers' Compensation Law Section Newsletter, Vol. VII, No. 177, at 17 (Jan. 2014) ("Plainly (and respectfully) the [*Tooey*] majority is incorrect in its statement that it was inconceivable that the legislature meant to bar both tort remedy *and* workers' comp (continued…)

Furthermore, even if one assumes that the Workers' Compensation Act's manifestation requirement is ambiguous, the *Tooey* Court still erred in its analysis. After finding the manifestation provision to be ambiguous, or at least hinting that it might be, the Court should have proceeded to consider the overarching statutory scheme in this area instead of simply invoking the law's remedial purpose as a sort of tiebreaker.[34] Had it broadened its view, the Court would have realized that the Occupational Disease Act—under which claimants who are time-barred by the Workers' Compensation Act's manifestation requirement would have parallel claims—contains a similar manifestation restriction that is not susceptible to a construction where *the entire statute* does not apply to time barred claims.[35] *Tooey* therefore should have recognized that, even if one

---

remedy. The genesis of occupational disease provisions in compensation acts is well known, and the legislature *definitely* intended this result." (emphasis in original)); *see also id.* at 18 ("[R]estricting diseased workers from workers' compensation may be unsatisfactory, but to posit that the alternative was *ever* thought to be a civil action constitutes the most astonishing revisionism." (emphasis in original)); *accord* TORREY, GREENBERG, & FIEDERER, *supra* note 8, § 1.92 ("The [*Tooey*] court concluded, errantly, that the legislature could not have intended that such late manifestation claims should be barred." (footnote omitted)).

[34] Indeed, today's Majority calls it "common sense" that the Workers' Compensation Act and the Occupational Disease Act "should be given a similar interpretation." Majority Opinion at 37.

[35] Section 301(c) of the ODA states that "[w]herever compensable disability or death is mentioned as a cause for compensation under this act, *it* shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry." 77 P.S. § 1401(c) (emphasis added). The variance in language between the ODA's manifestation provision and the Workers' Compensation Act's manifestation provision is highly illuminating. Whereas the Workers' Compensation Act uses the word apply ("it shall apply"), the ODA uses the word mean ("it shall mean"). Thus, the ODA's manifestation requirement is not even arguably susceptible to the construction that we embraced for the Workers' Compensation Act in *Tooey* because the ODA's language lacks any jurisdictional significance whatsoever. *Herold v. Univ. of Pittsburgh*, 291 A.3d 489, 503 (Pa. Cmwlth. 2023) ("Herold's construction merely highlights that the ODA covers his claim but, in fact, offers no compensation for his devastating illness.").

assumes that the entire Workers' Compensation Act does not apply to claimants whose occupational diseases manifest too late, those claimants would still be prevented from suing their employers in tort because of the ODA. The ODA's manifestation requirement, in other words, should have been a giant red flag, warning the *Tooey* majority that it was wrong about whether the General Assembly intended to deny some claimants both a civil remedy and an administrative one. Oddly, though, the *Tooey* Court's analysis did not even mention the ODA's manifestation or exclusivity provisions.

The *Tooey* Court also failed to acknowledge that, in the ODA, the General Assembly included a provision which provides a meager monthly stipend to workers who become disabled due to asbestosis, silicosis, or black lung disease, but who do not receive compensation because their "claim was barred by any of the time limitations prescribed by this act."[36] The General Assembly included this provision "as a matter of fairness" because it knew—contrary to what the *Tooey* Court said—that the disease

---

[36] Section 301(i) of the ODA provides as follows:

Notwithstanding any other provisions of this act, compensation for silicosis, anthraco-silicosis, coal worker's pneumoconiosis, and asbestosis shall be paid . . . at the rate of seventy-five dollars ($75) per month, to every employe totally disabled thereby as a result of exposure thereto, *who has not theretofore been compensated because his claim was barred by any of the time limitations prescribed by this act,* and shall continue during the period of such total disability. No compensation under this section shall be paid to any employe who has not been exposed to a silica, coal, or asbestos hazard within the Commonwealth of Pennsylvania for a period of two years. Subsequent to the effective date of this amending act of 1969, it shall be necessary to be a resident of Pennsylvania in order to qualify for compensation, but not to continue receiving the same after qualification. All such compensation to those whose last exposure precedes the effective date of this amending act shall be paid by the Commonwealth. Employes whose last exposure follows the effective date of this amending act and who become entitled to the compensation provided by this subsection shall be paid as provided by this act.

77 P.S. § 1401(i) (emphasis added).

manifestation requirement would "completely restrict recoveries" for some workers.[37] Yet, in the face of this reality, the *Tooey* Court chose to insist that the legislature did not intend what the ODA shows the legislature intended.[38]

Today's appeal now requires that we confront the ODA provisions that the *Tooey* Court ignored. Rather than interpreting the ODA as written, the Majority opts instead to double down on *Tooey*'s account of the legislature's intent. The Majority holds that the ODA should be construed consistent with the *Tooey* Court's interpretation of the Workers' Compensation Act—even though *Tooey* itself was poorly reasoned and the ODA's language is not even arguably amenable to the *Tooey* Court's construction.[39] Specifically, the Majority insists that "the ODA's exclusivity provision extends only to those claims asserting a *compensable* disability or death," meaning a disability or death that occurs within the ODA's four-year manifestation period.[40] But that is not what the statute says. The ODA's exclusive remedy provision applies to "*any* disability or death resulting from

---

[37] PBA Workers' Compensation Law Section Newsletter, Vol. VII, No. 177, at 18 (Jan. 2014); *Commonwealth v. College*, 439 A.2d 107, 109 (Pa. 1981) ("The manifest purpose of Section 301(i) was to afford compensation to totally disabled victims of black lung disease who otherwise would be barred from recovery by time limitations contained in the Act[.]").

[38] *Compare Tooey*, 81 A.3d at 864 ("It is inconceivable that the legislature, in enacting a statute specifically designed to benefit employees, intended to leave a certain class of employees who have suffered the most serious of work-related injuries without any redress under the Act or at common law."), *with* 77 P.S. § 1401(c) (defining compensable disability or death to mean "only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry"), *and* 77 P.S. § 1401(i) (establishing a right to a small monthly payment for any occupational disease claimant "who has not . . . been compensated because his claim was barred by any of the time limitations prescribed by this act").

[39] *See* Majority Opinion at 37 ("[W]e conclude that exclusivity provisions in the statutes should be given a similar interpretation.").

[40] *Id.* at 48 (emphasis in original).

occupational disease," regardless of whether that disability or death is a "*compensable disability or death*" under the Section 301(c) manifestation provision.[41]

The Majority justifies its artistic interpretation of the ODA by invoking the constitutional avoidance doctrine.[42] The Majority suggests that enforcing the ODA's exclusive remedy provision against workers whose statutory claims are barred by the manifestation requirement might violate Article III, Section 18 and/or Article I, Section 11 of the Pennsylvania Constitution[43] To avoid this supposed constitutional infirmity, the Majority insists upon giving the ODA a construction that the text of the statute cannot possibly bear.

I acknowledge the view, maintained by some writers in this area, that a so-called "dual denial" system—where the worker receives no statutory benefits but is nevertheless still blocked from filing a civil suit—unconstitutionally undermines the "grand bargain" underlying all compensation laws.[44] But this Court's jurisprudence to date has not fully

---

[41] 77 P.S. § 1403 (emphasis added); *id.* § 1401(c) (emphasis added).

[42] *See* 1 Pa.C.S. § 1922 (setting forth the presumption that "the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth"); Majority Opinion at 41 ("[W]e consider the constitutional issue as an aid in ascertaining the intent of the General Assembly regarding the breadth of the ODA's exclusivity provision.").

[43] PA. CONST. art. III, § 18 ("The General Assembly may enact laws requiring the payment by employers, or employers and employes jointly, of reasonable compensation for injuries to employes arising in the course of their employment, and for occupational diseases of employes, whether or not such injuries or diseases result in death, and regardless of fault of employer or employe[.]"); PA. CONST. art. I, § 11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.").

[44] *See* Emily A. Spieler, *(Re)assessing the Grand Bargain: Compensation for Work Injuries in the United States, 1900-2017*, 69 RUTGERS U. L. REV. 891, 998 (2017) ("The trend toward dual denial, in which workers have no legal recourse at all for injuries—
(continued…)

embraced that theory, which is no doubt why the Majority is careful to say only that denying statutory benefits while also precluding a tort suit would "arguably be in tension with" Article III, Section 18.[45]  The Majority is similarly noncommittal regarding Article I, Section 11, saying only that interpreting the ODA to preclude both an administrative remedy and a tort suit would "raise serious questions" under the Remedies Clause of our Constitution's Open Courts provision.[46]

The Majority's cageyness aside, I remain open-minded to the possibility that the disease manifestation requirements in the Workers' Compensation and Occupational Disease Acts unconstitutionally deny some segment of workers a remedy for their injuries.

---

whether or not their employers' have been negligent or reckless—is a complete abrogation of the initial 'bargain.'" (footnote omitted)).

[45]    Majority Opinion at 44.  If this Court were to hold that the Pennsylvania Constitution prohibits dual denial scenarios, that would have implications far beyond the present case because it would render the exclusivity provision unenforceable against claimants who, for one reason or another, cannot receive benefits under the statutory compensation schemes.  This includes, for example, claimants with so-called "mental-mental" injuries that do not result from "abnormal working conditions."  *See Payes v. W.C.A.B. (State Police)*, 79 A.3d 543, 551 (Pa. 2013) (explaining that claimants seeking benefits for psychic injuries caused by psychic stimuli must demonstrate that they were subjected to abnormal working conditions).  It would also presumably include other claimants who allege harms that do constitute an "injury" under the Workers' Compensation Act.  *See, e.g., Metro. Edison Co. v. W.C.A.B.*, 718 A.2d 759, 764 (Pa. 1998) (holding that "shift work maladaptation syndrome" does not constitute an "injury" under the Workers' Compensation Act).

[46]    *Id.*  Considering that this Court has never reached a majority consensus regarding the legal test to be applied under Article I, Section 11, it is unclear to me how the Majority can suggest with any real confidence that the ODA's manifestation requirement (if enforced as written) would violate that provision.  *See Yanakos v. UPMC*, 218 A.3d 1214, 1223 (Pa. 2019) (OAJC) (applying intermediate scrutiny); *id.* at 1227 (Donohue, J., concurring and dissenting) ("[T]he right to a remedy in Article I, Section 11 is a fundamental right which can only be infringed when there is a showing of a compelling state interest and that the means chosen to advance it are narrowly tailored to achieve the end."); *id.* at 1243 (Wecht, J., dissenting) ("[T]he legislature may abrogate or modify a common law cause of action in response to a clear social or economic need, so long as the challenged legislation bears a rational and non-arbitrary connection to that need.").

If those provisions are unconstitutional, however, the solution is to strike them from the law, thus leaving workers with late-manifesting occupational diseases free to seek compensation within the administrative scheme.  What I strongly object to is the Majority's suggestion that we should, based upon the constitutional avoidance doctrine, falsely assert that the General Assembly did not intend to deny a civil tort remedy to claimants whose diseases manifest too late.  The fact is that the legislature *did* intend to create a dual denial system.  The unambiguous text of the ODA is not reasonably susceptible to any other construction, and this Court has never explicitly held that such a system violates the Pennsylvania Constitution.  Put simply, I believe that today's decision uses and abuses the tools of statutory interpretation to distort, rather than uncover, the legislature's true intent.